369 S.E.2d 226

**CITY OF RIPLEY, West Virginia
a Municipal Corporation**

**v.**

**WEST VIRGINIA HUMAN RIGHTS
COMMISSION and Charla
Lynn Rhodes.**

**No. 17933.**

Supreme Court of Appeals of
West Virginia.

March 31, 1988.

Mary C. Buchmelter, Asst. Atty. Gen., Charleston, for WVHRC and Betty Agsten Hamilton.

Ted Wilkins, Ripley, for City of Ripley.

PER CURIAM:

This is an appeal by the West Virginia Human Rights Commission (Commission) and Charla Lynn Rhodes from a final order of the Circuit Court of Jackson County, entered on April 8, 1986, reversing and setting aside the Commission's order of October 30, 1985, which found that the City of Ripley (City) was in violation of the West Virginia Human Rights Act because it had illegally discriminated against the respondent based upon sex.

Charla Lynn Rhodes is a white female who applied to the City for a position as a patrol officer/policeman on May 28, 1979, and again on February 13, 1981. Beginning in about 1978, Ms. Rhodes performed volunteer work as a member of the Ripley auxiliary police force. Auxiliary police were not permitted to carry weapons but did assist the regular force in such matters as traffic control. They also occasionally rode with regular officers on patrol. Auxilliary police were not permitted to function alone but only in concert with a regular police officer. At the time of the matters at issue in this case, Ms. Rhodes was attending Parkersburg Community College working toward a degree in criminal justice. She had been employed as a clerk at Heck's since 1977.

When Ms. Rhodes first applied for a position as a regular police officer with the City in 1979, there was no vacancy in the department. In the same year, the City hired one Kenneth Winter as a "trainee" regular police officer under the federal government's CETA program. While employed by the City under the CETA program, Mr. Winter's salary was paid by the federal government.

In about February of 1981, it became generally known in the Ripley Police Department that a vacancy would soon need to be filled on the regular police force. Ms. Rhodes completed an application and took it to the Mayor, who advised her that Mr. Winter, the CETA employee, would be hired for the position. Ms. Rhodes was never interviewed for the position nor was the position ever formally advertised by newspaper or by any other formal means.

There is no dispute that in 1981, Ms. Rhodes had the basic qualifications for service as a police officer for the City. While Ms. Rhodes had not passed a state mandated training course for police officers held at the State Police Academy as legally required by state law, such certification was not a legal requirement at the time of her application. At the time of Ms. Rhodes' application, the City did not have uniform, qualifying standards for eligibility as police officers.

Since Mr. Winter was hired in 1981, the City has hired four more police officers, all of whom are male. Three of these police officers were certified when hired, and the one officer who was not certified when hired was a veteran, 50% of whose salary after being hired was subsidized from a federal veteran's program for his training at the State Police Academy. During hearings held in this matter, the Mayor of the City testified that the cost to the City for sending someone through the training course was $6,500. Therefore, the City would prefer new police officers to possess state certification when they apply. At the time of the Mayor's testimony, there were applications on file from five females for positions on the police force. However, the lack of certification on the part of these female applicants was a major factor in excluding them from consideration for employment.

The Commission ruled that the City unlawfully discriminated against Ms. Rhodes on the basis of sex in violation of *W.Va. Code*, 5–11–9 [1977] and ordered the City to pay Ms. Rhodes the difference between what she would have earned as a police officer and what she did earn; ordered the City to hire Ms. Rhodes when the next position comes available; and awarded her $5,000 for embarrassment and humiliation.

*W.Va.Code*, 5–11–9 [1977], places the burden on the complainant to show that they were victims of illegal discrimination. In general, a prima facie case of discrimination against a member of a protected class can be proven by direct or circumstantial evidence, or by inferential evidence, or by a combination of evidence. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.3d 668 (1973). The *McDonnell Douglas* analysis of the evidence was accepted by this Court in *Shepherdstown Volunteer Fire Department v. West Virginia Human Rights Commission*, 172 W.Va 627, 309 S.E.2d 342 (1983). In accepting the *McDonnell Douglas* rationale, this Court stated in Syllabus Point 3 of *Shepherdstown Volunteer Fire Department v. West Virginia Human Rights Commission, supra:*

> In an action to redress unlawful discriminatory practices in employment and access to "places of public accommodations" under the West Virginia Human Rights Act, as amended, W.Va.Code, 5–11–1 et seq., the burden is on the complainant to prove by a preponderance of the evidence a prima facie case of discrimination, which burden may be carried by showing (1) that the complainant belongs to a protected group under the statute; (2) that he or she applied and was qualified for the position or opening; (3) that he or she was rejected despite his or her qualifications; and (4) that after the rejections the respondent continued to accept the qualifications of similarly qualified persons. If the complainant is successful in creating this rebuttable pre-

sumption of discrimination, the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination.

Furthermore, we stated in Syllabus Point 2 of *State ex rel. State of West Virginia Human Rights Commission v. Logan–Mingo Area Mental Health Agency*, 174 W.Va. 711, 329 S.E.2d 77 (1985):

"A complainant in a disparate treatment, discriminatory discharge case brought under the West Virginia Human Rights Act, Code, 5–11–1 et seq., may meet the initial prima facie burden by proving by a preponderance of the evidence, (1) that the complainant is a member of a group protected by the Act; (2) that the complainant was discharged, or forced to resign, from employment; and (3) that a nonmember of the protected group was not disciplined, or was disciplined less severely, than the complainant, though both engaged in similar conduct."

Although the present case is not a case of discriminatory discharge from employment, it does involve allegations of unequal or disparate treatment between a member of the protected class and others, and this prima facie test is a useful and workable test for unequal treatment of employees.

■ In the present case, the Commission correctly found that Ms. Rhodes made an initial *prima facie* showing that the City discriminated against her on the basis of sex by demonstrating that: (1) she was a female and a member of a protected class under the Act; (2) she was qualified for the position at the time of her application but she was not considered for it; (3) she was rejected for the position despite her qualifications; and, (4) a white male was hired in her place. The City's hiring procedure allowed for considerable subjectivity.

Once the complainant has established a *prima facie* case of discrimination, the bur-

den of proof shifts to the employer to articulate a legitimate nondiscriminatory reason for its actions. In this regard, the employer attempted to set forth economic reasons for its failure to hire Ms. Rhodes because it would cost the City a great deal of money to pay for her certification through training at the State Police Academy.

Once the employer has met its burden of proof, the complainant must show by a preponderance of the evidence that she was a victim of unlawful discrimination. To do so, the complainant must demonstrate that the reason proferred by the employer is untrue or not the true motivation for its action. See, *State ex rel. State of West Virginia Human Rights Commission v. Logan–Mingo Area Mental Health Agency, supra.*

In the present case, the City has denied employment to more than one female on the basis of a lack of state certification. We note that at the time of her application in 1981, such certification was not a legal requirement for employment. Indeed, the City had no objective process for selection of police officers. Furthermore, applicants for positions with local police departments may still be hired without the necessity of such certification (passage of a training course or its equivalent), but they must obtain it in order to remain employed. See, *W.Va.Code*, 30–29–1, *et seq.* Evidence that Ms. Rhodes was qualified for the position but was not hired because she was not certified, and evidence that certification was not a requirement for initial employment, combined with evidence that there had been no female police officers employed by the City, leads us to the conclusion that the City's stated reasons for not hiring Ms. Rhodes were pretextual. Consequently, we believe the Circuit Court of Jackson County was incorrect and erred in reversing the Commission.

For the foregoing reasons, the final order of the Circuit Court of Jackson County is hereby reversed and the final order of the West Virginia Human Rights Commission reinstated.

Reversed; final order of Human Rights Commission reinstated.

Justice NEELY dissents on the grounds that the small budget of the City of Ripley and the need to allocate all available funds to the immediate delivery of governmental services make the City's economic reasons persuasive. Therefore, Justice NEELY believes that the City of Ripley has met its burden because no police officer was hired while Ms. Rhodes sought employment who required as high an allocation of City money as Ms. Rhodes for mandatory training.