383 S.E.2d 490

**WEST VIRGINIA INSTITUTE
OF TECHNOLOGY**

v.

**WEST VIRGINIA HUMAN RIGHTS
COMMISSION and Hassan
Zavareei, Ph.D.**

No. 18608.

Supreme Court of Appeals of
West Virginia.

June 28, 1989.

Anthony F. Serreno, Asst. Atty. Gen., Charleston, for West Virginia Institute of Technology.

Sharon M. Mullins, Asst. Atty. Gen., Charleston, for HRC.

Lee H. Adler, Beckley, for Hassan Zavareei.

McHUGH, Justice:

This appeal presents some novel issues for this Court to decide, including whether there was employment discrimination because of national origin and whether there should be a limited period for which back pay may be recovered in a compensation disparity case under the West Virginia Human Rights Act. The final order of the circuit court affirming (with a clerical change) the decision of the West Virginia Human Rights Commission adverse to the employer is affirmed in part and modified in part, for the reasons set forth in this opinion.

### I.

The complainant, Hassan Zavareei, Ph. D., is a native of Iran.[1] The complainant was hired by the employer, the West Virginia Institute of Technology, on August 10, 1974, as an assistant professor of economics. His starting annual salary was $10,629, which was the same salary paid to his predecessor, an instructor without a doctorate degree, plus $504 to recognize his "all but dissertation" status toward his Ph.D. degree at that time.

In January, 1975, the employer hired a Mr. Thomas Bell, a non-Iranian, also as an assistant professor of economics, at a starting annual salary of $12,636, the amount paid to his predecessor, and about twenty percent greater than the complainant's salary. Mr. Bell at the time he was hired had less teaching experience and fewer graduate hours than the complainant. He was hired with the express understanding that he must obtain a doctorate degree within seven years. He never accomplished that goal during the entire period of time in controversy.

During the 1977–78 school year, the complainant, on the other hand, obtained his Ph.D. degree and was awarded the normal $500 pay raise for that accomplishment. After considerable struggle the employer's president reluctantly ratified the complainant's colleagues' evaluation of him and promoted him to associate professor during the 1978–79 school year.[2] As a result of this promotion the complainant received the normal $400 pay raise. Mr. Bell, in contrast, was not promoted to associate professor until the 1983–84 school year.

For each of the school years between 1975–76 and 1984–85, the complainant and Mr. Bell received *exactly the same amount* of statutory increases in salary; in all but two of those years the complainant's *percentage* increases, calculated for purposes of this litigation, were greater than Mr. Bell's solely because the complainant's salary was less than Mr. Bell's. At the end of the 1984–85 school year, Mr. Bell was still receiving a greater salary than the complainant ($22,536 per year, compared with $21,641 per year for the complainant). For the school year 1983–84, when Mr. Bell was promoted to associate professor without a doctorate degree, he received $20,958 plus $400 for the promotion, while the complainant received

---

**1.** The complainant became a citizen of the United States in 1977.

**2.** The complainant was criticized by the employer's president for the complainant's role in advocating the position of Iranian students on campus.

$20,112, despite the fact that the complainant had earned his doctorate degree about six years earlier and had been promoted to associate professor about five years earlier.

During the 1982–83 school year, the employer hired a Mr. Rajendra Gupta, a native of India, as an assistant professor to teach finance and economics courses. Mr. Gupta had a masters, but not a doctorate, degree and was paid a starting annual salary of $22,500. At that time the complainant, in his ninth year with the employer, had his doctorate degree and was an associate professor but was paid an annual salary of $20,112.

The complainant discovered the compensation disparities between Messrs. Bell and Gupta and himself on an unspecified date in August, 1984, when the facts about the salaries of the faculty were disseminated. The complainant filed his complaint with the West Virginia Human Rights Commission ("the Commission") on November 9, 1984. In his complaint he alleged employment discrimination (salary disparity) based upon his national origin (Iran). After an evidentiary hearing in September, 1985, a hearing examiner for the Commission found, in December, 1985, that the salary disparity realized by the complainant was due to his national origin. The hearing examiner recommended an award of back pay in the amount of $7,029 and incidental damages for embarrassment and humiliation in the amount of $10,000.

The Commission in May, 1986, adopted the hearing examiner's findings of fact and conclusions of law, but awarded $5,000, not the recommended $10,000, for incidental damages.

On appeal the Circuit Court of Kanawha County, West Virginia, in November, 1987, affirmed the Commission's ruling, with a "clerical change," as stipulated by the parties, pertaining to the amount of back pay,

$12,576.04, then due, along with modifications with respect to the calculation of interest.

The employer subsequently brought this appeal to this Court. The employer asserts that the circuit court committed reversible error by affirming the Commission's finding that the salary disparity realized by the complainant was because of his national origin. Should the finding of disparate-treatment employment discrimination be affirmed, the employer contends that the award of back pay should not be calculated all the way back to the time the complainant was hired but, rather, should be limited so that the back-pay award is to commence no earlier than the date two years immediately preceding the time when the complaint was filed with the Commission, that is, no earlier than November 9, 1982.

## II.

### A.

As a threshold argument the employer claims that the complainant failed to establish a prima facie case of disparate treatment (compensation disparity) based upon the complainant's national origin (Iran). We disagree.

*W. Va. Code*, 5–11–2, as amended,[3] which is part of the West Virginia Human Rights Act,[4] states the legislative declaration of policy with respect to, *inter alia*, employment discrimination because of certain prohibited factors, including national origin or ancestry: "It is the public policy of the [S]tate of West Virginia to provide all of its citizens equal opportunity for employment, ... Equal opportunity in the area[ ] of employment ... is hereby declared to be a human right or civil right of all persons without regard to ... national origin [or] ancestry[.]" Under *W. Va. Code*, 5–11–9(a),

---

**3.** The 1989 amendment to *W. Va. Code*, 5–11–2 is not applicable to this case. *See* Enrolled Conference Committee Substitute for House Bill 2516, 1989 *W. Va. Acts* ch. ____ (adding, effective July 1, 1989, "familial status" as a forbidden criterion for the availability of housing accommodations, etc.).

**4.** The West Virginia Human Rights Act is codified as *W. Va. Code*, 5–11–1 to 5–11–19, as amended.

as amended,[5] it is an unlawful discriminatory practice "[f]or any employer to discriminate against an individual with respect to compensation ... if the individual is able and competent to perform the services required[.]" *W. Va. Code,* 5–11–3(h), as amended, defines the terms "discriminate" or "discrimination" to mean, in relevant part, "to exclude from, or fail or refuse to extend to, a person equal opportunities because of ... national origin [or] ancestry[.]"[6]

■ Because this case gives us the first opportunity to discuss employment discrimination because of national origin, we have not heretofore discussed the elements of a prima facie case in this specific context.[7] This Court has, however, previously formulated a general test for a prima facie case of disparate-treatment employment discrimination, and that test is applicable to a case, such as this one, involving an employment-related decision made allegedly because of a complaint's national origin. In syllabus point 3 of *Conaway v. Eastern Associated Coal Corp.,* 178 W.Va. 164, 358 S.E.2d 423 (1986), involving alleged age discrimination, our holding on this point was stated as follows:

In order to make a prima facie case of [disparate-treatment] employment discrimination under the West Virginia Human Rights Act, W.Va.Code § 5–11–1 [to 5–11–19, as amended], the plaintiff must offer proof of the following:

(1) That the plaintiff is a member of a protected class.

(2) That the employer made an adverse decision concerning the plaintiff.

(3) But for the plaintiff's protected status, the adverse decision would not have been made.

*Accord,* syl. pt. 1, *Mingo County Equal Opportunity Council v. State Human Rights Commission,* 180 W.Va. 240, 376 S.E.2d 134 (1988) (age discrimination case).[8]

There is no dispute in the present case that the first two elements of the general disparate-treatment prima facie test, membership in a protected class (national origin) and an adverse decision (compensation disparity), have been established here. The employer claims, though, that the third ele-

**5.** The 1989 amendment to *W.Va.Code,* 5–11–9, relating to "familial status," is not applicable to this case. *See supra* note 3.

**6.** The 1987 and 1989 amendments to other definitions contained in other subdivisions of *W.Va. Code,* 5–11–3 are not relevant to this case.

The 1989 amendment adding "familial status" to the definition of "discriminate" or "discrimination," contained in 5–11–3(h), is not applicable to this case. *See supra* note 3.

We note that *W.Va.Code,* 51–11–3, as amended, does not contain any definitions of "national origin" or "ancestry." The corresponding federal legislation, Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, also forbids employment discrimination "because of ... national origin[.]" 42 *U.S.C.* § 2000e–2(a)(1) (1982). The federal statute does not define "national origin." The Supreme Court of the United States, in *Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287, 291 (1973), held that "[t]he term 'national origin' ... refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." That definition is valid under our statute, too, which refers to "national origin [or] ancestry."

**7.** This Court very recently did discuss the elements of a prima facie case of discrimination in

a place of public accommodations because of national origin. Syl. pt. 1, *K–Mart Corp. v. West Virginia Human Rights Commission,* 181 W.Va. 473, 383 S.E.2d 277 (W.Va.1989). The specific test announced there, referring to the public accommodations, is very similar to the general test for a prima facie case of disparate-treatment employment discrimination.

**8.** The Supreme Court of the United States has noted that the federal anti-employment discrimination legislation, Title VII of the Civil Rights Act of 1964, as amended, "treats each of the enumerated [protected class] categories exactly the same." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244 n. 9, 109 S.Ct. 1775, 1787 n. 9, 104 L.Ed.2d 268, 283 n. 9 (1989) (sex discrimination case). Therefore, "our specific references to gender throughout this opinion, and the principles we announce [on the respective burdens of producing evidence], apply with equal force to discrimination based [up]on race, religion, or national origin." *Id.* The same is true for the protected classes under the West Virginia Human Rights Act.

We note, too, that there is a distinctive test for a prima facie case of disparate *impact. See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). The present case involves disparate *treatment.*

ment, the "but for" element, has not been established. Again, we disagree.

■ In *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 170–71, 358 S.E.2d 423, 429–30 (1986), this Court spoke to the type of evidence required to make a prima facie case of disparate-treatment employment discrimination. We stated there that because discrimination is essentially an element of the mind, there will normally be very little, if any, direct evidence available. Direct evidence is not, however, necessary. What is required of the complainant is to show some circumstantial evidence which would sufficiently link the employer's decision and the complainant's status as a member of a protected class so as to give rise to an inference that the employment-related decision was based upon an unlawful discriminatory criterion.

■ There is sufficient evidence on the whole record that the complainant's national origin was the motivating factor in determining the complainant's compensation. The employer's vice-president for academic affairs testified that "quite often we have had international people take salaries [offered to them] that we could not get other people for." This testimony, viewed in light of the disparate treatment of the complainant *vis-a-vis* the non-Iranian faculty members with respect to compensation for identical or very similar duties, raises an inference that but for the complainant's national origin the compensation disparity would not have existed. For example, the inference of employment discrimination because of the complainant's national origin is raised by the salary disparity between Mr. Gupta and the complainant, who had more impressive qualifications. At the time Mr. Gupta was hired at a $2,000–plus greater salary than the complainant's salary, the complainant had a doctorate degree, while Mr. Gupta had a master's degree, and the complainant was an associate professor, while Mr. Gupta was being hired as an assistant professor for very similar courses. A comparison of the complainant's and Mr. Bell's salaries and qualifications likewise raises an inference of employment discrimination because of nation-

al origin. We conclude that the employer's assertion that the "but for" element of a disparate-treatment prima facie case was lacking here is without merit.

## B.

■ What was said in *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071 (5th Cir.1981), is equally apposite in this case and ties in with the second step in the proof of alleged disparate-treatment employment discrimination:

> Dr. Spinks testified that he hired [p]rinters at a salary determined by the job market place and by an informal assessment of his staff, ... [I]f the difference in labor value of a white printer and a black printer stems from the market place putting a different value on race, Title VII is violated. 42 U.S.C.A. § 2000e–2(a)(1). It does not matter that the school officials got along with Pittman, nor does it matter how much they held their beliefs in good faith that they were not engaging in racial discrimination simply by paying the going rate for a black. The differential in pay is violative of Title VII absent some reason other than an impermissible one such as race.

*Id.* at 1074. It follows that the complainant's prima facie case of disparate-treatment employment discrimination can be rebutted by the employer's presentation of evidence showing a legitimate and nondiscriminatory reason for the employment-related decision in question which is sufficient to overcome the inference of discriminatory intent. *See* syl. pt. 2, *Mingo County Equal Opportunity Council v. State Human Rights Commission*, 180 W.Va. 240, 376 S.E.2d 134 (1988). Within syllabus point 3 of *Shepherdstown Volunteer Fire Dept. v. State ex rel. State Human Rights Commission*, 172 W.Va. 627, 309 S.E.2d 342 (1983), this Court expressed in the following manner this second step in the analysis of alleged disparate-treatment employment discrimination: "If the complainant is successful in creating this rebuttable presumption of discrimination, the burden then shifts to the respondent to offer some

legitimate and nondiscriminatory reason for the rejection [or other employment-related decision]." *Accord,* syl. pt. 2, in part, *Ranger Fuel Corp. v. West Virginia Human Rights Commission,* 180 W.Va. 260, 376 S.E.2d 154 (1988); syl. pt. 4, in part, *Conaway v. Eastern Associated Coal Corp.,* 178 W.Va. 164, 358 S.E.2d 423 (1986); *Frank's Shoe Store v. West Virginia Human Rights Commission,* 179 W.Va. 53, 60, 365 S.E.2d 251, 258 (1986); syl. pt. 1, in part, *State ex rel. State Human Rights Commission v. Logan–Mingo Area Mental Health Agency, Inc.,* 174 W.Va. 711, 329 S.E.2d 77 (1985).[9]

As the *Pittman* case, quoted above, holds, a so-called "job market value" reason advanced by an employer is not recognized as a legitimate defense to compensation disparity when such value is premised solely upon an impermissible discrimination, such as pay distinctions between the sexes, races, respective ethnic backgrounds or other protected classes. One of the fundamental purposes of antidiscrimination legislation is to forbid such distinctions. As stated previously, the employer's vice-president for academic affairs testified that certain "international people" had often accepted faculty positions at salaries below that which natives of this country would accept. The employer by this testimony alone did not, however, actually indicate that an illegitimate "job market value" reason was a motivating factor in setting the complainant's salary.

Instead, the employer in this case presented evidence of a facially legitimate and nondiscriminatory reason for the compensation disparity, specifically, that a faculty member's salary was dictated by the existing amount of compensation for the position at the time of hire and that the salary could not have been adjusted subsequently by moneys from other faculty positions later becoming vacant or from other areas in the institution's budget.

### C.

■ The third and final step in the proof of alleged disparate-treatment employment discrimination is that the complainant will still prevail in a disparate-treatment employment discrimination case if the complainant shows by the preponderance of the evidence that the facially legitimate reason given by the employer for the employment-related decision is merely a pretext for a discriminatory motive. *See* syl. pt. 3, *Mingo County Equal Opportunity Council v. State Human Rights Commission,* 180 W.Va. 240, 376 S.E.2d 134 (1988). Within syllabus point 3 of *Shepherdstown Volunteer Fire Dept. v. State ex rel. State Human Rights Commission,* 172 W.Va. 627, 309 S.E.2d 342 (1983), we stated this principle as follows: "Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination." [10]

■ "Pretext" means an ostensible reason or motive assigned as a color or cover for the real reason or motive; false appearance; pretense. *Black's Law Dictionary* 1069 (5th ed.1979). A proffered reason is a pretext if it was not "the true reason for the decision[.]" *Conaway v. Eastern Associated Coal Corp.,* 178 W.Va. 164, 171, 358 S.E.2d 423, 430 (1986).[11]

**9.** Per curiam opinions of this Court on point are: syl. pt. 1, in part, *City of Ripley v. West Virginia Human Rights Commission,* 179 W.Va. 375, 369 S.E.2d 226 (1988); syl. pt. 1, in part, *Fourco Glass Co. v. State Human Rights Commission,* 179 W.Va. 291, 367 S.E.2d 760 (1988); syl., in part, *Pride, Inc. v. State ex rel. State Human Rights Commission,* 176 W.Va. 565, 346 S.E.2d 356 (1986); syl. pt. 2, in part, *Montgomery General Hospital v. West Virginia Human Rights Commission,* 176 W.Va. 580, 346 S.E.2d 557 (1986).

**10.** *In accord* are the cases cited at note 9 *supra* and in the text accompanying that note, beginning with syl. pt. 4, in part, of *Conaway.*

**11.** "Pretext" cases, such as this one, are to be distinguished from "mixed motive" cases, that is, cases involving a mixture of legitimate and illegitimate motives, such as *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). As cogently explained by Justice White, concurring in *Price Waterhouse,* the issue in pretext cases is whether *either* an illegal motive or a legal motive, *but not both,*

"The third step of the ... proof scheme, pretext, is a ... realization that some explanations are the product of hindsight rather than a true barometer of what occurred at the time of decision." *Taylor v. City National Bank,* 642 F.Supp. 989, 995 (S.D.W.Va.1986) (Haden, C.J.), *aff'd mem.,* 836 F.2d 547 (4th Cir.1987).

The record indicates, *inter alia,* that the West Virginia Board of Regents, along with the legislature, ultimately determined the employer's budget, and that the Board of Regents had, throughout the period in controversy, a written policy which permitted the employer to exercise its discretion to seek correction by the Board of Regents of salary inequities. The employer never exercised this discretion to seek correction of the salary disparity between the complainant and Messrs. Bell or Gupta. In addition, a $3,000 salary raise was given to a non-Iranian (a Mr. James Oxendale), similarly situated to the complainant, out of $45,000 of "equity" pay-raise moneys available to the employer for the 1984–85 school year, while the complainant did not get a penny of that available money.

The hearing examiner found: "The totality of the evidence indicates that the explanation articulated by the Respondent for the disparity in pay between the Complainant and the higher paid [non-Iranian] professors were [sic] in fact pretextual and unworthy of credence." The hearing examiner also found

> that the Institution could have exercised the init[i]ative to approach the Board of Regents *at any time* to seek an adjustment in the Complainant's salary. The Examiner was not moved by the ... witness' opinion that the Institution did not

exercise that [initiative] due to the remoteness of the likelihood of success.

(emphasis added) The Commission adopted these findings.

In syllabus point 1 of *West Virginia Human Rights Commission v. United Transportation Union, Local 655,* 167 W.Va. 282, 280 S.E.2d 653 (1981), *questioned on another point, Independent Fire Co. No. 1 v. West Virginia Human Rights Commission,* 180 W.Va. 406, 409, 376 S.E.2d 612, 615 (1988), this Court set forth the scope of judicial review in cases under the West Virginia Human Rights Act: "West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties." *Accord, Chico Dairy Co. v. West Virginia Human Rights Commission,* 181 W.Va. 238, 241 n. 1, 382 S.E.2d 75, 78 n. 1 (1989), *opinion as modified on denial of rehearing;* syl. pt. 1, *Board of Education v. West Virginia Human Rights Commission,* 182 W.Va. 41, 385 S.E.2d 637 (1989), syl. pt. 1, *Bishop Coal Co. v. Salyers,* 181 W.Va. 71, 380 S.E.2d 238 (1989), *as modified on rehearing;* syl. pt. 1, *Frank's Shoe Store v. West Virginia Human Rights Commission,* 179 W.Va. 53, 365 S.E.2d 251 (1986); syl. pt. 4, *State ex rel. State Human Rights Commission v. Logan–Mingo Area Mental Health Agency, Inc.,* 174 W. Va. 711, 329 S.E.2d 77 (1985). "Substantial evidence" is such relevant evidence, on the whole record, as a reasonable mind might accept as adequate to support a finding; it must be enough to justify a refusal to direct a verdict, if the factual matter were tried to

---

was *the* true motive behind the decision. In mixed motive cases, however, there is no one "true" motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate and at least one of which is illegitimate. 490 U.S. at 261, 109 S.Ct. at 1796, 104 L.Ed.2d at 294. In mixed motive cases, once a complainant proves that a prohibited factor (race, gender, national origin, etc.,) played a motivating part in the employment-related decision, the employer may avoid a finding of liability only by proving by a preponderance of the evidence that the employer would have made the same decision even if the em-

ployer had not considered the prohibited factor. 490 U.S. at 259, 109 S.Ct. at 1795, 104 L.Ed.2d at 293.

This case is not a "mixed motive" case. The testimony of the employer's witness that certain "international people" were more likely to accept low salaries than natives of this country was sufficient, along with the salary-comparison evidence, to establish a prima facie case. On the other hand, as stated previously, this testimony was insufficient by itself to indicate that an illegitimate "job market value" reason was a motivating factor in determining the complainant's salary.

a jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131, 140 (1966). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* at 620, 86 S.Ct. at 1026, 16 L.Ed.2d at 141. *See also* 5 K. Davis, *Administrative Law Treatise* § 29:22 (2d ed.1984). The reviewing court is not entitled to reverse the finding of the trier of the facts simply because the reviewing court is convinced that it would have weighed the evidence differently if it had been the trier of the facts. *Frank's Shoe Store v. West Virginia Human Rights Commission*, 179 W.Va. 53, 56, 365 S.E.2d 251, 254 (1986).

■ Based upon our review of the record we conclude that, while the evidence is conflicting, there is substantial evidence in support of the hearing examiner's (and the Commission's) finding that the employer's existing-salary-for-the-position/lack-of-adjustability reason was pretextual for the true reason for the salary disparity: the complainant's national origin. *Cf. Gupta v. East Texas State University*, 654 F.2d 411, 414–15 (5th Cir.1981) (college professor alleged disparate-treatment employment discrimination by college because of national origin (India); evidence supported fact finder's determination that employer's reasons, not specified in the opinion, were not pretextual for salary disparity); *Banerjee v. Board of Trustees*, 648 F.2d 61, 66 & n. 10 (1st Cir.) (college teacher alleged disparate-treatment employment discrimination by college because of national origin (India); evidence supported fact finder's determination that employer's reasons, including a "glut" of qualified applicants in the marketplace and fewer faculty retirements at the time, were not pretextual for denial of professorial tenure), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

This Court, by this opinion, does not imply that the compensation of persons who are not, or whose ancestors were not, natives of this country must always be at least equal to the compensation of persons who are natives of this country. The West Virginia Human Rights Act, like its federal counterpart, "eliminates certain bases [such as race, gender, national origin, etc.,] for distinguishing among employees while otherwise preserving employers' freedom of choice." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 109 S.Ct. 1775, 1784–85, 104 L.Ed.2d 281 (1989). Antidiscrimination legislation "does not demand that an employer give preferential treatment to minorities or women [or other protected classes]. The statute was not intended to 'diminish traditional management prerogatives.' ... [para.] ... Rather, the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096–97, 67 L.Ed.2d 207, 219 (1981) (citations omitted).

For the reasons stated above, the finding of unlawful disparate-treatment employment discrimination because of national origin is affirmed.

### III.

The employer, citing *Burkey v. Marshall County Board of Education*, 513 F.Supp. 1084, 1097–98 (N.D.W.Va.1981), argues next that the award of back pay should accrue from a date no earlier than two years immediately preceding the filing of the complaint with the Commission. *See also Payne v. Weirton Steel Co.*, 397 F.Supp. 192, 195–96 (N.D.W.Va.1975). *See generally* annotation, *Award of Back Pay in Suit Under Title VII of Civil Rights Act of 1964, as Amended by Equal Employment Opportunity Act of 1972 (42 USCS §§ 2000e et seq.), for Discriminatory Employment Practices*, 21 A.L.R.Fed. 472 (1974 and Supp.1988), especially § 9[c] on commencement of period covered by back-pay award. This Court disagrees with the employer's argument on this point.

Unlawful employment discrimination in the form of compensation disparity based upon a prohibited factor such as race, gender, national origin, etc., is a "continuing violation," so that there is a present violation of the antidiscrimination statute for as long as such compensation disparity exists; that is, each paycheck at the discriminatory rate is a separate link in a chain of violations. Therefore, a disparate-treatment employment discrimination complaint based upon allegedly unlawful compensation disparity is timely brought if it is filed within the statutory limitation period after such compensation disparity last occurred. These points were stated in the following manner in syllabus point 1 of *Sigurdson v. Isanti County,* 433 N.W.2d 910 (Minn.Ct.App.1988), *review granted* (Minn. Feb. 22, 1989): "Appellant's action was timely in that respondents, by failing to correct [a] salary structure which carries the indicia of past discrimination, have engaged in a continuing discriminatory employment practice against appellant." *See also Bazemore v. Friday,* 478 U.S. 385, 395–96, 106 S.Ct. 3000, 3006–07, 92 L.Ed.2d 315, 328 (1986); *Jenkins v. Home Insurance Co.,* 635 F.2d 310, 312 (4th Cir.1980); *West Virginia Human Rights Commission v. United Transportation Union, Local 655,* 167 W.Va. 282, 292, 280 S.E.2d 653, 658–59 (1981), *questioned on another point, Independent Fire Co. No. 1 v. West Virginia Human Rights Commission,* 180 W.Va. 406, 409, 376 S.E.2d 612, 615 (1988); *Russell Sage College v. State Division of Human Rights,* 45 A.D.2d 153, 155, 357 N.Y.S.2d 171, 172 (1974), *aff'd,* 36 N.Y.2d 985, 337 N.E.2d 119, 374 N.Y.S.2d 603 (1975).[12]

In the present case the complaint was filed with the Commission on November 9, 1984. The salary disparity still existed at that time. Accordingly, the complaint was timely filed within ninety days after the alleged discrimination, as required by *W.Va.Code,* 5–11–10 [1971].[13]

The question which is presented here is not whether the right to claim unlawful discrimination is time-barred, but whether the *remedy* of back pay, based upon the timely brought complaint, should be limited. "[W]hat is at issue is not a statute of limitations in the usual sense but rather a substantive cap on the amount of backpay that may be awarded." *Laffey v. Northwest Airlines, Inc.,* 740 F.2d 1071, 1094 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985).

In 1972, the Federal Equal Employment Opportunity Act, 42 *U.S.C.* §§ 2000e to 2000e–17, as amended, ("the EEO Act") added a new provision to Title VII of the Civil Rights Act of 1964 which placed a two-year cap on recovery of back pay under the EEO Act: "Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the [Equal Employment Opportunity] Commission." 42 *U.S.C.* § 2000e–5(g) (1982). This new cap on back pay recoverable under the EEO Act was not itself to be applied retroactively to "pre–1972" Title VII cases. "The subsequent enactment cannot be indicative of the [same] prior congressional intent." *Equal Employment Opportunity Commission v. Enterprise Association Steamfitters Local 638,* 542 F.2d 579, 590 (2d Cir.1976), *cert. denied,* 430

---

**12.** This Court has recognized that continuing violation cases are not helpful in determining when the statute of limitations begins to run in a case involving a discrete, noncontinuing violation, such as a discriminatory discharge case. *Independent Fire Co. No. 1 v. West Virginia Human Rights Commission,* 180 W.Va. 406, 409 n. 8, 376 S.E.2d 612, 615 n. 8 (1988).

**13.** *W.Va.Code,* 5–11–10 was amended in 1987 to, *inter alia,* increase the period for filing a complaint with the Commission from 90 days to 180 days.

For comparison purposes only, we note that the complainant also, apparently, filed his complaint within 90 days after *discovering* the salary disparity sometime in August, 1984, while the complainant in *Jenkins v. Home Insurance Co.,* 635 F.2d 310 (4th Cir.1980), was held to have timely filed her complaint based upon salary disparity even though she filed her complaint three years and four months after discovering the salary disparity, inasmuch as the complaint was filed within the requisite 180 days after the last *occurrence* of the continuing salary disparity. *Id.* at 311.

U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977).[14]

■ *W.Va.Code,* 5–11–10 [1971, 1987] provides in relevant part that upon a finding of an unlawful discriminatory practice the West Virginia Human Rights Commission shall "take such affirmative action, including ... upgrading of employees, with or without back pay, ... as in the judgment of the commission, will effectuate the purposes of this article[.]" Thus, the West Virginia Human Rights Act does not contain any limitation or cap on back-pay recovery. The back-pay provisions of *W.Va. Code,* 5–11–10 have remained unchanged since the reenactment of the West Virginia Human Rights Act on July 1, 1967. *See* 1967 *W.Va. Acts* ch. 89.

We noted this back-pay distinction between the West Virginia Human Rights Act and the Federal Equal Employment Opportunity Act in *Kerns v. Bucklew,* 178 W.Va. 68, 74 n. 9, 357 S.E.2d 750, 756 n. 9 (1987), and also cited there the provisions of 42 *U.S.C.* § 2000e–7 (1982):

Nothing in [the EEO Act] shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under [the EEO Act].

We believe this federal statute contemplates, *inter alia,* the enforceability in state courts of state antidiscrimination statutes which do not limit back pay. For example, although the issue of limits on back pay was apparently not raised in *Greyhound Lines–East v. Geiger,* 179 W.Va. 174, 178, 366 S.E.2d 135, 139 (1988), this Court, in a continuing violation case, affirmed the award of back pay commencing with the effective date of the reenactment of the West Virginia Human Rights Act, specifically, July 1, 1967, for violations starting prior to that date. The earlier case of *Greyhound Lines–East v. Geiger,* 168 W.Va. 229, 230, 283 S.E.2d 858, 858 (1981), indicated that the complaint was filed with the West Virginia Human Rights Commission on January 28, 1972.[15]

This Court is aware of the fact that *W.Va.Code,* 21–5B–4(1)(a) [1965], within the Equal Pay for Equal Work Act, limits an award of back pay under that Act to the one-year period preceding the commencement of an action based upon discrimina-

---

**14.** The federal courts did, however, apply, by analogy, the most appropriate state statute of limitations to create a cap on back pay in "pre–1972" Title VII cases, where there was no back-pay cap in the equivalent state antidiscrimination statute to "borrow" for federal purposes. The theory was that otherwise there would be potentially unlimited back-pay liability. The types of state statutes of limitations most frequently applied in these federal, "pre–1972" Title VII cases were those pertaining expressly to recovery of wages or those pertaining expressly to a liability created by statute, when no other time limit is fixed by the statute creating the liability. Most of these statutes of limitations were for two or three years. *See, e.g., Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 466–71 (D.C.Cir.1976) (collecting cases), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978), *rejected on an unrelated point, McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 134, 108 S.Ct. 1677, 1682, 100 L.Ed.2d 115, 123 (1988).

However, as the court observed in *Laffey v. Northwest Airlines, Inc.,* 740 F.2d 1071 (D.C.Cir. 1984), *cert. denied,* 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985), the current two-year federal statutory cap on back-pay recovery is not addressed, as a statute of limitations is, to the timeliness of the filing of charges so as to prevent the prosecution of stale claims. Instead, the federal statutory back-pay cap "equitably" defines the maximum remedy against employers who have been engaged in continuing discrimination for many years. 740 F.2d at 1094.

Moreover, as another state court of last resort has recently remarked, we recognize that the federal, "pre–1972" Title VII cases are persuasive, but *not* binding, in determining the meaning of our state human rights statute which does not contain a back-pay cap. *Kentucky Commission on Human Rights v. City of Owensboro,* 750 S.W.2d 422, 423 (Ky.1988).

**15.** The record here does not establish laches in the sense discussed in *Maynard v. Board of Education,* 178 W.Va. 53, 62, 357 S.E.2d 246, 255 (1987), involving delay and substantial prejudice to the public's fiscal integrity resulting from a large retroactive monetary award.

In addition, the employer has not claimed that the complainant, who has remained an employee, should have mitigated his damages, other than by complaining sooner. As discussed previously, his complaint for the continuing violation was timely filed.

tion between the sexes in the payment of wages for work of comparable character requiring comparable skills. For some reason, however, the legislature two years later chose not to include a limitation on back pay recoverable under the West Virginia Human Rights Act, and the legislature has also decided in the years since 1972 not to amend the West Virginia Human Rights Act to "track" the Federal Equal Employment Opportunity Act's two-year limit on back pay.[16]

Our opinion that the West Virginia Human Rights Act as currently written does not authorize time limits on back pay in continuing violation cases is reinforced by two important purposes of back pay under such Act, namely, a "self-correction" purpose and a "make whole" purpose, as found to be applicable also to the Federal Equal Employment Opportunity Act in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). In that case the Supreme Court of the United States first discussed the "self-correction" purpose of back pay:

> If employers faced only the prospects of an injunctive order, they would have little incentive to shun practices of dubious legality. It is the reasonably certain prospect of a backpay award that 'provide[s] the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.'

*Id.* at 417–18, 95 S.Ct. at 2371–72, 45 L.Ed.2d at 296–97 (citation omitted). *Albemarle Paper* then discussed the "make whole" purpose of back pay:

> It is also the purpose of Title VII to make persons whole for injuries suffered

on account of unlawful employment discrimination.... [W]here a legal injury is of an economic character,

> '[t]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury.... The injured party is to be placed, as near as may be, in the situation he [or she] would have occupied if the wrong had not been committed.'

*Id.* at 418–19, 95 S.Ct. at 2372, 45 L.Ed.2d at 297 (citation omitted). The key holding in *Albemarle Paper* was that, "given a finding of unlawful discrimination, backpay should be [judicially] denied [in whole or in part] only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.* at 421, 95 S.Ct. at 2373, 45 L.Ed.2d at 298–99. Judicially created time limits on back pay would frustrate those purposes.

As a partial denial of back pay, the authority to limit back pay must be as narrowly constrained as the authority to totally deny the same, as set forth in the key holding of *Albemarle Paper*, just quoted. *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 471 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978), *rejected on an unrelated point*, *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134, 108 S.Ct. 1677, 1682, 100 L.Ed.2d 115, 123 (1988). This Court agrees with these statements from *Laffey v. Northwest Airlines, Inc.*, 481 F.Supp. 199, 202 (D.D.C.1979), *modified on another point*, 740 F.2d 1071, 1093 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985):

> It seems, therefore, that the legislature explicitly limits certain types of awards when that is its intent.
> We express no opinion here on whether the monetary limits on liability set forth in the Governmental Tort Claims and Insurance Reform Act would violate the "open courts" provision of *W.Va. Const.* art. III, § 17 or any other provision of the State *Constitution*.

**16.** In contrast to the absence of a limit on back pay under the West Virginia Human Rights Act is, for example, the stated limit of $500,000 on noneconomic losses under the Governmental Tort Claims and Insurance Reform Act. *W.Va. Code,* 29–12A–7(b) [1986]. The same section, however, imposes no limit on ascertainable compensatory damages, and *W.Va.Code,* 29–12A–18(c) [1986] exempts from the restrictions under that Act employees' claims for lost wages.

With respect to the size of the award, it is nowhere suggested in *Albemarle* that this is a factor to be considered by the Court in limiting the amount of the backpay award.... The size of the backpay claim relates directly to the massive wrong [the employer] inflicted upon the Plaintiffs. If wrongs may remain uncompensated because they are expensive to the wrongdoer, it would violate the instruction of *Albemarle* that 'backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.'

Moreover, the back-pay provisions of *W. Va. Code*, 5–11–10 [1971, 1987] must not be judicially restricted in light of the liberal construction required by *W. Va. Code*, 5–11–15 [1967] to be given generally to provisions of the West Virginia Human Rights Act.[17]

For the foregoing reasons, we hold that *W. Va. Code*, 5–11–10, as amended, does not authorize a "cap" or time limits on back pay in continuing violation cases.

### IV.

The Commission awarded to the complainant $5,000 as "incidental damages" for humiliation, embarrassment, emotional and mental distress and loss of personal dignity caused by the unlawful discrimination in this case. In *Bishop Coal Co. v. Salyers*, 181 W.Va. 71, 380 S.E.2d 238 (1989), *as modified on rehearing*, this Court held that the Commission's authority to award this type of damages was limited and held that, in cases, such as this one, which were already before us, any awards of incidental damages in excess of $2,500 would be reduced to that figure. Accordingly, the complainant's award of incidental damages is reduced to $2,500.

Reasonable attorney's fees, including those incurred in this appeal, are, upon itemization before the circuit court, to be recovered by the complainant.

### V.

Based upon all of the above, the final order of the circuit court is affirmed, except the portion thereof relating to incidental damages, which is modified as set forth in section IV. of this opinion.

Affirmed in part; Modified in part.

---

17. This principle of liberal construction does not apply in ascertaining if an act is an unlawful discriminatory practice, for *W.Va.Code*, 5–11–3(i) [1971, 1989] states that "[t]he term 'unlawful discriminatory practices' includes only those practices specified in section nine of this article[.]" *See Chico Dairy Co. v. West Virginia Human Rights Commission*, 181 W.Va. 238, 242, 382 S.E.2d 75, 79 (1989), *opinion as modified on denial of rehearing.*