629 S.E.2d 762

**MAYFLOWER VEHICLE SYSTEMS, INC., Petitioner Below, Appellant**

v.

**Vincent E. CHEEKS, and the West Virginia Human Rights Commission, Respondents Below, Appellees.**

No. 32864.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 28, 2006.

Decided March 31, 2006.

704

PER CURIAM:

In this appeal from the Circuit Court of Kanawha County, we are asked to examine a circuit court's orders affirming a decision by the West Virginia Human Rights Commission ("the Commission") that an employer engaged in unlawful race-based discrimination against two employees. The employer appeals and raises two points of error. First, the employer argues that the evidence is not sufficient to support a finding of unlawful discrimination. Second, the employer argues that the Commission and circuit court erred in their calculation of back pay damages regarding one of the two employees.

We have given careful consideration to the extensive evidentiary record developed below, the briefs and arguments of the parties, and all other matters of record. As set forth below, we affirm the Commission's determination, and the circuit court's orders upholding that determination, finding that the employer engaged in unlawful discrimination. However, we reverse the circuit court's order regarding the back-pay damages awarded to one of the employees, and remand the case to the circuit court for reconsideration of the date that those damages began to accrue.

I.

In 2001, appellant Mayflower Vehicle Systems, Inc., ("Mayflower") operated a vehicle-parts manufacturing facility in South Charleston, West Virginia. Mayflower had an attendance policy that permitted an employee to accrue eight unexcused absences in a calendar year. These absences are also referred to in the record as "no call, no show" absences.

When an employee accrued a ninth unexcused absence, the employee was generally—but not always—terminated. Mayflower produced records indicating at least eighty-six employees had been terminated under this attendance policy. The records suggest that after Mayflower had decided to terminate an employee for excessive unexcused absences, the employee was permitted an opportunity to discuss the absences with Mayflower's human resources director. In some cases, the employee was not terminat-

Mark A. Atkinson, Esq., Paul L. Frampton, Jr., Esq., Atkinson, Mohler & Polak, Charleston, for Appellant.

Darrell V. McGraw, Attorney General, Jonathan L. Matthews, Assistant Attorney General, Charleston, Attorneys for Appellees.

ed; in others, the employee was terminated, but later rehired. The record suggests that some employees with excessive absences were asked to sign what are referred to as "last chance" agreements. It further appears that some of the employees who were terminated were rehired only after pursuing a union grievance proceeding.

Appellee Vincent Cheeks is an African American who worked for Mayflower as a laborer and press operator, and had accrued eight absences by October 2001. Mr. Cheeks suffered from a back sprain, high blood pressure, and hemorrhoids so severe that he would often have blood running down his legs at work. These medical conditions caused Mr. Cheeks to miss three days of work— October 11th, 12th, and 18th. Mr. Cheeks got a note from his doctor explaining his serious medical problems. Upon his return to work on October 19th, Mr. Cheeks tried to obtain a medical leave application from Mayflower, but did not receive one from the human resources department until October 25th.[1] Mr. Cheeks returned the medical leave application and note from his doctor to Mayflower on October 30th, but the application was stamped by Mayflower as "Received Oct. 31, 2001."

Mr. Cheeks' medical conditions caused him to again miss work on November 1st and 2nd, and he again visited his doctor and procured a note excusing him from work. Mr. Cheeks returned to work on November 5, 2001, his next regularly scheduled work day, and was called into the office of Mayflower's human resources manager. At that time, Mayflower terminated Mr. Cheeks for excessive absences due to his absences on October 11th and 12th. Mayflower asserted that the absences were unexcused, and asserted that Mr. Cheeks had never returned an application for medical leave.[2]

The union which represented Mayflower's employees filed a grievance challenging Mayflower's decision to terminate Mr. Cheeks. In a March 13, 2002 memorandum denying the grievance, Mayflower took the position that at the time of his termination, "Mr. Cheeks had obtained not only his 9th occurrence, but reached his 12th occurrence." Mayflower—for the first time—asserted that it had a policy requiring that medical leave applications be returned within fifteen days *after an absence,* and that otherwise the applications would be disavowed.[3] Mayflower asserted that "Mr. Cheeks was given paperwork for his absences on October 12, 2001 and October 13, 2001," but did not turn in the application "until his termination date of November 5, 2001," "well after the 15 days allowed." The memorandum makes no mention of Mr. Cheeks' October 18th absence, and no mention that he had turned in a medical leave application on October 31st. Furthermore, Mayflower took the position that, even if the October 12th and 13th absences were excused, Mr. Cheeks presented *no excuse for the November 1st and 2nd* absences.[4]

Union representatives, apparently lacking the documentation contained in Mayflower's files to challenge Mayflower's assertion that Mr. Cheeks had not promptly returned his

1. A human resources employee made a notation of the date the form was given to Mr. Cheeks— "10–25–01"—on the upper right corner of the application. The text of the application states, "This form must be returned within 15 calendar days."

2. Mayflower's attendance policy classified a medically-excused absence as "FMLA" leave, in reference to the Family Medical Leave Act. Mr. Cheeks' attendance record noted his termination with a handwritten note saying "never returned FMLA paperwork."

3. We note that, contrary to Mayflower's assertion, the application for medical leave *does not* state that the application must be returned within fifteen days of an illness. The application also

does not say that an illness will be recorded as unexcused if the application is returned more than fifteen days after an illness. The application instead states:

A leave request [using this form] based on an employee's serious health condition ... must be accompanied by a verifying medical certification from a physician. This form must be completed for consideration. This form must be returned within 15 calendar days. Failure to do so may result in denial of leave until such certification is provided.

4. Copies of the physician's written excuses—apparently taken from Mayflower's employment records for Mr. Cheeks—for the October 12th, 13th, 18th, and November 1st and 2nd illnesses are contained in the record.

medical leave application for the October 2001 absences, or any documentation to dispute Mayflower's assertion that Mr. Cheeks had no medical excuse for the absences in November 2001, dropped the grievance did not pursue any additional relief for Mr. Cheeks.[5]

Appellee Samuel R. Lewis is an African American who worked for appellant Mayflower as a laborer and supervisor. By late July 2001, Mr. Lewis had accrued eight absences. Mr. Lewis, however, contends that several of these absences should have been recorded as excused vacation days because he did "call in" to the plant ahead of time and inform his supervisor he would be absent.

Mr. Lewis testified that his duties as a supervisor included retrieving messages from a telephone answering machine. Employees would call the telephone number and leave a message on the answering machine explaining that they were going to be taking a vacation day or otherwise be absent. The employee's supervisor would then listen to the message, and record the employee's absence as excused. However, Mr. Lewis testified that several supervisors retrieved the messages from same machine, and that many times the first supervisor to listen to the

messages would delete the messages without making any record of each employee's call. It appears that some supervisors would make a record of calls from their own employees, and would delete calls made by other supervisors' employees. The result was that many employees' absences would be incorrectly recorded as a "no call, no show" unexcused absence. When the error was brought to the supervisor's attention, the supervisor could log into the employee's computer record and properly record the absence.[6]

Mr. Lewis testified that the call-in system for reporting absences was riddled with errors, and that he was repeatedly a victim of this system.[7] He stated that on several occasions he had to approach the director of human resources to have his employment record changed, because although he had called the plant in advance to request a vacation day, his absence had been recorded as a "no call, no show" absence. The human resources director apparently refused to acknowledge that Mr. Lewis had called in his absences, and at some point refused to stop correcting his employment record.[8]

Mr. Lewis was injured in a buvette altercation, and as a result missed work on August

---

**5.** As we discuss in greater detail later in this opinion, Mayflower asserts that the union dropped its grievance for Mr. Cheeks on July 19, 2002. Unfortunately, we can find no mention of this date anywhere in the record, and Mayflower's appellate briefs do not provide any guidance on the source of this date.

**6.** As Mr. Lewis explained in his testimony:

The system they had was you gave them a number. Now, me, Jody ..., and I can't think of the other group leader that had the same phone number, okay. If Jody gets there before I do, and somebody calls in, and if I—if she gets there before I do, if she hears all the messages, if she don't save 'em, they're gone. If she don't tell me, which it happened to me a couple of times, a couple of my people, she never—she erased the message and didn't tell me, I put 'em down as a no call / no show. Because I don't—there's nothing on the recorder so I gotta say it's no call / no show.... [T]hen I go back, and the people say no, I called in a vacation day that day, then I gotta change that. And they had—they trained us how to change that on the computers; they trained us group leaders. We had a certain number we could go into—how to go in, 'cause that's how we had to do our time ourself.

**7.** Mayflower has apparently abandoned this call-in answering-machine system after Mr. Lewis was terminated. Employees must now call the plant and explain their absence to a person. As Mr. Lewis said:

They have a different system, now.... Now they changed it to where you gotta call into a security and they log it which they should have done in the first place; that's the way they should have done in the first place and then there wouldn't be no dispute.

**8.** Mr. Lewis testified:

And so there was a couple times I had to do there, and there was a couple times it happened to me after I was salaried that I had to [go to the human resource director's] office to explain to her that I called in a vacation day; and she says "I'm not going to do this for you again." I said, "... these are my days, it's not my fault, it's your system's fault. If somebody goes in there and erase it, it's not my fault, you know." And I had to do that twice and she said, "This is the last time I will do anything for you, Sam." And that was her exact words, you know; and it was not my fault, I had the vacation day, and you can call in a vacation day.

17, 2001. Upon his return to work, Mr. Lewis brought his absence—which had apparently been overlooked—to the attention of the human resources department. The absence was then recorded in Mr. Lewis' employment record as his ninth unexcused absence. Mr. Lewis contended that he had, as a supervisor, seen white employees receive "second-chance" agreements from the human resources director after accruing nine or ten absences, and he presumed that he would be able to make the same arrangements. The human resources director refused to meet with Mr. Lewis to discuss his absences, and he was terminated on August 22, 2001.

Mr. Lewis, through a union representative, filed a first-level grievance. The grievance was reviewed by the Mayflower human resources director and denied on September 28, 2001. As her reasoning for denying the grievance, the human resources director stated that Mr. Lewis had never approached her regarding his absences to ask for help, even though "Mr. Lewis had many opportunities to come to me before he received his 9th occurance [sic]." Mr. Lewis asked his union representative to appeal the grievance denial, but for reasons that are not clear in the record, no appeal was filed and Mr. Lewis' termination became final.[9]

Mr. Cheeks and Mr. Lewis subsequently filed separate complaints with the West Virginia Human Rights Commission ("the Commission"), alleging discrimination on the basis of race by Mayflower had occurred in the termination process. Because of the similarity of the evidence and witnesses in both complaints, the Commission moved to consolidate both cases. The consolidation motion was granted.

At a public hearing on the two complaints in September 2003, the Commission and Mayflower introduced a joint exhibit consisting largely of Mayflower's employment records. The parties agree that Mayflower's employment records indicate that eighty-six employees had been terminated, apparently without regard to race, under Mayflower's absence policy for excessive absences.

However, the joint exhibit also indicates that thirteen employees were rehired after violating the absence policy, and all of those employees were white. Prior to Mr. Cheeks and Mr. Lewis filing their complaints with the Commission, no African American employee terminated by Mayflower had been so rehired.

More importantly, the joint exhibit and the testimony presented at the hearing suggest that Mr. Cheeks and Mr. Lewis were treated differently from similarly-situated white employees when rehiring decisions were being made. For instance, the joint exhibit contains several examples of white employees with medical problems who—like Mr. Cheeks—were terminated for excessive absences, but who were later rehired (and in many cases given back pay) when it was demonstrated to the human resources director that the absences were the result of a medical condition.[10] The joint exhibit also

---

**9.** The record suggests that the union did not pursue an appeal because Mayflower's human resources director may have told the union representative that Mr. Lewis had been "given his days back." Another reason may be that the union representative never gave Mr. Lewis the correct papers to file an appeal until after the appeal period had expired.

**10.** For example, Kevin S. was a white employee terminated for excessive absences on February 4, 2000, and rehired on February 24, 2000, with the time off being treated as a "suspension" for excessive absences. Kevin S. was again terminated for excess absences on June 9, 2000, and reinstated—at a higher pay rate—with no loss of pay on July 25, 2001, when Mayflower determined that the absences were a result of being on plant medical leave.

Darren B. was a white employee who was an alcoholic, and who was repeatedly sanctioned for absenteeism in the 1990s. Darren B. was disciplined for performance-related problems in January 2000, was disciplined for five "lates" in a month in February 2000, was notified by May 2000 that he had accrued eight unexcused absences, and was later written up for leaving work early three times. Darren B. was written up again for accruing eight unexcused absences in a one year period on January 21, 2001, and again for accruing eight absences—one of which was as a result of an arrest for driving under the influence—on June 1, 2001. On June 13, 2001, Darren B. accrued a ninth absence. When he met with a Mayflower human resources employee the next day, Darren B. was not terminated but was instead asked to sign a "last chance agreement." Mayflower also, admirably, re-

contains examples of white employees who, unlike Mr. Cheeks or Mr. Lewis, were disciplined for serious on-the-job performance concerns, and who were terminated two and three times for accruing excessive absences, and yet were repeatedly rehired by Mayflower under "last chance" agreements.[11]

After assessing this evidence, in a final order dated September 10, 2004, the Commission found that discrimination had occurred in appellant Mayflower's decision not to rehire the appellees, Mr. Cheeks and Mr. Lewis. The Commission concluded, on the one hand, that Mayflower regularly discharged employees who had accrued nine unexcused absences without regard to the race of the employee. On the other hand, the Commission concluded that unlawful discrimination on the basis of race occurred when Mayflower made its decision not to rehire the appellees. Mayflower was ordered to pay incidental damages to both appellees for their pain, suffering and humiliation; damages for back pay; and ordered to rehire the appellees, and until they were rehired, pay the appellees damages for front pay.

As a result of appeals and petitions for review by the parties, the case has been reviewed twice by an administrative law judge; twice by the Commission as a whole;

and finally by the Circuit Court of Kanawha County.

In an order dated February 28, 2005, the circuit court refused Mayflower's appeal of the Commission's September 10, 2004 decision, to the extent it concerned Mr. Lewis' case, for lack of jurisdiction. The circuit court found neither Mr. Lewis' back pay award nor his award of other damages met the jurisdictional requirements of *W.Va.Code*, 5–11–11(a) [1989] ("in the following cases the appellant may prosecute the appeal in the circuit court of Kanawha County ... (1) Cases in which the commission awards damages other than back pay exceeding five thousand dollars; [or] (2) cases in which the commission awards back pay exceeding thirty thousand dollars[.]")

In an order dated March 4, 2005, the circuit court affirmed the Commission's decision regarding Mr. Cheeks.

Mayflower now appeals the circuit court's orders.

## II.

Mayflower's appeal challenges two aspects of the Commission's September 10, 2004 decision, and the circuit court's February 28 and March 4, 2005 orders affirming that decision. First, Mayflower asserts that there is insufficient evidence to support a finding that

---

ferred Darren B. to a hospital for the treatment of his alcoholism.

Lisa T. was a white employee who returned to work from an illness and was terminated on June 27, 2003 for excessive unexcused absences. She was never given an opportunity to explain that her absences were the result of illnesses that were excusable under Mayflower's medical leave policy. A union representative filed a grievance with the human resources director, explaining that Lisa T. had been terminated before ever being given an opportunity to apply for medical leave. It appears that on July 14, 2003, the human resources director reversed her decision, reinstated Lisa T. to her job and made a note in Lisa T.'s file that she had been "made whole [in] regard [to] all monies and all lost seniority."

**11.** For example, Todd B., a white employee, has two memos in his employment file regarding his being drunk on the job on two different occasions in 2001; one memo indicates that Todd B. was escorted from the plant and ordered not to return to work drunk. The employment file also has several "write-ups" for Todd B. repeatedly

being late to work, or leaving work early. Todd B. was terminated for excessive absences on June 15, 2000, and rehired under a "last chance" agreement on July 31, 2000; was terminated and rehired under another "last chance" agreement on May 29, 2001; and was terminated for ten absences on September 4, 2001, and was rehired under a "last chance" agreement on November 26, 2001. Todd B. was finally terminated for excessive absences on September 13, 2002.

Terry S., a white employee, was terminated on May 22, 2000, for accruing ten absences between December 20, 1999 and May 13, 2000; he was rehired under a last chance agreement on July 11, 2000. On November 17, 2000, Terry S. came to the plant but was "in no shape to work." Terry S. saw one supervisor in the parking lot and "ran to get away" from him. Another supervisor found Terry S., sent him home and Mayflower terminated Terry S. for "violation [of] company policy." However, Terry S. was rehired—at a higher salary and with ten vacation days—in September 2001, and given another pay raise in November 2001.

unlawful discrimination occurred against Mr. Cheeks and Mr. Lewis. Second, Mayflower asserts that the decision improperly calculated Mr. Cheeks' damages. Mayflower does not challenge the calculation of Mr. Lewis' damages.

 With regard to this Court's review of the factual findings and legal conclusions made by the Commission and the circuit court, this Court is bound by the statutory standards contained in *W.Va.Code*, 29A-5-4(a). Questions of law are reviewed *de novo;* findings of fact are accorded deference unless the findings are clearly wrong. Syllabus Point 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996). *See also*, Syllabus Point 1, *West Virginia Human Rights Commission v. United Transportation Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981)("West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties.") *W.Va.Code*, 29A-5-4 requires a court to

> reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

Syllabus Point 2, *Shepherdstown Volunteer Fire Department v. State ex rel. State of*

West Virginia Human Rights Commission, 172 W.Va. 627, 309 S.E.2d 342 (1983).

With these standards in mind, we turn to the parties' arguments.

### III.

 The preliminary issue we must briefly address is this Court's jurisdiction to hear appellant Mayflower's appeal of appellee Mr. Lewis' case.

At the outset of this case, the Commission moved to consolidate appellee Mr. Cheeks' complaint and appellee Mr. Lewis' complaint for joint consideration, because the evidence, witnesses, and circumstances of both employees were closely related. The Commission's September 10, 2004 final decision intertwines the facts and legal conclusions of both appellees in one order. Nowhere in the record do we see any indication that the Commission ever moved to separate these two complaints for individual consideration.

However, during Mayflower's appeal to the circuit court, the Commission took the position that the appellees' complaints were individual cases, and that the damages awarded to each appellee had to be considered separately by the circuit court for purposes of jurisdiction. The circuit court concluded that it did not have jurisdiction to review Mr. Lewis' case because the damages awarded to Mr. Lewis did not exceed the monetary thresholds set forth in *W.Va.Code*, 5-11-11(a).[12]

Furthermore, on appeal to this Court, the Commission asserts that since the circuit court had no jurisdiction over Mr. Lewis' separate complaint, Mayflower should have filed any appeals from the Commission's decision directly with this Court. By failing to do so, the Commission argues that Mayflow-

---

12. *W.Va.Code*, 5-11-11(a) states, in pertinent part:

> From any final order of the commission, an application for review may be prosecuted by either party to the supreme court of appeals within thirty days from the receipt thereof by the filing of a petition therefor to such court against the commission and the adverse party as respondents, ... Provided, That in the following cases the appellant may prosecute the appeal in the circuit court of Kanawha County

pursuant to section four, article five, chapter twenty-nine-a of this code: (1) Cases in which the commission awards damages other than back pay exceeding five thousand dollars; (2) cases in which the commission awards back pay exceeding thirty thousand dollars; and (3) cases in which the parties agree that the appeal should be prosecuted in circuit court. Mr. Lewis was awarded $3,277.45 for humiliation, embarrassment, emotional distress and loss of personal dignity, and $18,107.92 in back pay.

er's appeal of the decision in Mr. Lewis' case is 150 days too late.[13]

We reject the Commission's jurisdictional arguments outright. What the Commission joined together by its own motion, it cannot presume will suddenly be put asunder by a respondent's filing of a petition for review or appeal. The Commission made no motion to separate the two appellees' cases, and it is patently unfair for the Commission to play "gotcha" and assert that the cases automatically separated on appeal.

The two cases of the appellees were joined for consideration below, and the Commission's decisions assess the two cases as one. Furthermore, the Commission has never made a motion to "un-join" the cases. Accordingly, we now turn to consider parties' arguments as to the merits of both cases.

## A.

Appellant Mayflower challenges the Commission's and circuit court's decision that unlawful discrimination occurred. Mayflower asserts that the factual record does not support a finding of unlawful discrimination.

The Commission concluded that the complainants, Mr. Cheeks and Mr. Lewis, were the victims of unlawful discrimination under the West Virginia Human Rights Act. *W.Va. Code*, 5–11–9(1) [1998] of the Act makes it unlawful "[f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required[.]" The term "discriminate" or "discrimination" is defined by *W.Va.Code*, 5–11–3(h) [1998] to mean "exclude from, or fail or refuse to extend to, a person equal opportunities because of race[.]"

■ Proving discrimination under the Act is a three-step inferential proof formula first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this formula, a

complainant must first establish a *prima facie* case of discrimination; the respondent has the opportunity to articulate a legitimate nondiscriminatory reason for its action; and finally, the complainant must show that the reason proffered by the respondent was not the true reason for the decision, but rather was a pretext for discrimination. As we stated in Syllabus Point 3, in part, of *Shepherdstown Volunteer Fire Dept. v. State ex rel. State of West Virginia Human Rights Com'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983):

> In an action to redress unlawful discriminatory practices in employment ... under The West Virginia Human Rights Act, *as amended*, *W.Va.Code*, 5–11–1 *et seq.*, the burden is upon the complainant to prove by a preponderance of the evidence a prima facie case of discrimination, which burden may be carried by showing (1) that the complainant belongs to a protected group under the statute; (2) that he or she applied and was qualified for the position or opening; (3) that he or she was rejected despite his or her qualifications; and (4) that after the rejection the respondent continued to accept the applications of similarly qualified persons. If the complainant is successful in creating this rebuttable presumption of discrimination, the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination.

■ In order to prove a *prima facie* case of discrimination under the Act, the Commission must show:

> (1) That the plaintiff is a member of a protected class.

> (2) That the employer made an adverse decision concerning the plaintiff.

---

**13.** The final order of the Commission was issued on September 10, 2004, and the petition for appeal to this Court was filed on April 22, 2005.
 *W.Va.Code*, 55–11–11(a) states that appeals from the Commission directly to the Supreme

Court of Appeals must be filed within thirty days of receipt of the Commission's order. Likewise, appeals from a circuit court order must be filed within thirty days of entry of a final order of the circuit court.

(3) But for the plaintiff's protected status, the adverse decision would not have been made.

Syllabus Point 3, *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986).

■■■ " 'Pretext' means an ostensible reason or motive assigned as a color or cover for the real reason or motive; false appearance; pretense." *W.Va. Institute of Technology v. W.Va. Human Rights Comm'n*, 181 W.Va. 525, 531, 383 S.E.2d 490, 496 (1989) (*quoting Black's Law Dictionary* 1069 (5th ed.1979)). A proffered reason is a pretext if it was not "the true reason for the decision[.]" *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. at 171, 358 S.E.2d at 430. "The third step of the ... proof scheme, pretext, is a ... realization that some explanations are the product of hindsight rather than a true barometer of what occurred at the time of decision." *Taylor v. City National Bank*, 642 F.Supp. 989, 995 (S.D.W.Va.1986).

■■■ Pretext may be shown through direct or circumstantial evidence of falsity or discrimination; and, where pretext is shown, discrimination may be inferred. Syllabus Point 5, *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995). As we stated in Syllabus Point 5 of *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 479 S.E.2d 561 (1996):

In disparate treatment cases under the West Virginia Human Rights Act, W.Va. Code, 5–11–9 (1992), proof of pretext can by itself sustain a conclusion that the defendant engaged in unlawful discrimination. Therefore, if the plaintiff raised an inference of discrimination through his or her prima facie case and the fact-finder disbelieves the defendant's explanation for the adverse action taken against the plaintiff, the factfinder justifiably may conclude that the logical explanation for the action was the unlawful discrimination.

■■■ The issue in pretext cases is often whether either an illegal motive, or a legal motive (but not both), was the true motive behind the adverse decision by the employer. However, a complainant under the Human Rights Act may also show pretext through a "mixed motive" analysis. A mixed motive analysis applies where the employer articulates a legitimate nondiscriminatory reason for its decision which is not pretextual, but where the complainant demonstrates that a discriminatory motive nonetheless played a significant part in the employer's adverse decision against the complainant. Mixed motive cases are, simply, cases involving a mixture of legitimate and illegitimate motives; there is no one single "true" motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate and at least one of which is illegitimate. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *West Virginia Institute of Technology v. West Virginia Human Rights Com'n*, 181 W.Va. 525, 531–32 n. 11, 383 S.E.2d 490, 496–97 n. 11 (1989). Once the complainant shows that the complainant's protected class membership played *some* part in the employer's decision, the burden then shifts to the employer to prove by a preponderance of the evidence that the same decision would have been made in the absence of the discriminatory motive. *Barefoot v. Sundale Nursing Home*, 193 W.Va. at 485 n. 16, 487 n. 18, 457 S.E.2d at 162 n. 16, 164 n. 18.

■■■ Examining the record in the instant case, it is clear that the Commission made out a *prima facie* case of race discrimination in respect to Mayflower's failure to rehire Mr. Cheeks and Mr. Lewis subsequent to their terminations. Both Mr. Cheeks and Mr. Lewis are African Americans, a protected class under the Act, and by refusing to rehire either individual, Mayflower subjected the appellees to an adverse action. The Commission demonstrated that at least thirteen employees had been rehired—some two or three times—after being terminated for accruing nine unexcused absences. However, prior to Mr. Lewis' and Mr. Cheeks' complaints being filed with the Commission, none of those employees who were rehired were African American. This evidence is sufficient to create an inference that unlawful discrimination on the basis of race occurred.

The Commission having established a *prima facie* case, the burden shifted to May-

flower to articulate a nondiscriminatory reason for why the appellees were not rehired. Mayflower contends that the appellees were not rehired because they did not pursue the union grievance process to its final stages. Mayflower asserts that the situations of the appellees were substantially different from those of the employees who were rehired, because the employees who were rehired had successfully pursued a union grievance. Mayflower argues that the appellees were terminated for a nondiscriminatory reason— excessive absences—and that they were not rehired because the union failed to diligently pursue grievances on behalf of the appellees. Mayflower asserts that if any discrimination occurred, it was in the union's decision to drop the appellees' grievances, not in Mayflower's failure to rehire. In sum, Mayflower argues that, as a matter of law, the positions of the appellees cannot be compared with the positions of the white employees who were rehired, because those rehirings were a result of the union grievance process.

The evidence of record does not support Mayflower's position. The record indicates that many of the white employees terminated and then rehired by Mayflower never turned to the union for assistance. In their cases, Mayflower reversed its decision once it learned that its decision had been in error, or was unduly harsh, or when Mayflower simply decided to give the employee a "second chance."

For example, Roger T. was a white employee who worked under the supervision of Mr. Lewis. Mr. Lewis testified that he repeatedly saw Roger T. violate company policy with impunity. Roger T. kept his job without union involvement. Roger T.'s employment file indicates he was many times caught sleeping on the job, and repeatedly cited for poor work performance, clocking out early, leaving the plant without permission, and arriving late to work. After receiving two "third and final warnings" for absenteeism, Roger T. accrued ten absences in a

one-year period. Roger T., however, was not terminated; instead, when he was threatened with termination, Mayflower contends that Roger T. produced a subpoena showing that one of the ten days was an excused absence. There is nothing in the record showing that the union was involved in Mayflower's decision to retain Roger T., even though he had accrued nine unexcused absences.[14]

Another employee, Donald M., missed work for medical reasons, but when he failed to turn in a medical leave application, he was terminated for accruing ten unexcused absences. Donald M. was rehired several weeks later, also apparently without union involvement.[15]

The record contains other examples that vitiate Mayflower's argument. In sum, it appears that Mayflower routinely gave employees who violated company policy, including the nine-unexcused-absence policy, a "second chance" without union involvement.

 Moreover, the law does not support Mayflower's position. An employee's failure to participate in a union grievance proceeding does not, as a matter of law, make that employee's situation wholly dissimilar from and uncomparable to that of another employee who did participate in a union grievance proceeding. When examining whether employees are similarly situated, it must be considered whether the employees were "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir.1996), *quoting Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). The test is whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989). Exact correlation between employees' cases is not necessary; the pro-

---

**14.** Roger T. was finally terminated after destroying company property.

**15.** Donald M. was terminated on June 21, 2000, and rehired July 11, 2000. He was also given two days of vacation upon his rehiring. A May-

flower representative testified that Donald M. was rehired pursuant to negotiations with the union, but there is no documentation from Donald M.'s employment file that supports this testimony.

ponent of the evidence must only show that the cases are "fair congeners." *Id.* A union's involvement in one employee's situation but not in another's does not *per se* make the two employees dissimilar. Rather, a finder of fact must look at all of the factors relevant to the comparison, including the reasons behind the termination and the reasons behind the union's pursuit or non-pursuit of the employees' grievances.

■■■ As stated previously, appellant Mayflower appears to have rehired some employees without requiring the employees to pursue the grievance process, and rehired others after considering their union grievance. But even comparing the appellees' cases against only the situations of the rehired employees who did pursue a union grievance, it appears that Mayflower was possessed of all the evidence necessary and sufficient to rehire Mr. Cheeks and Mr. Lewis, but declined to do so—even though their situations were roughly equivalent to those of the white employees who were rehired. Mr. Cheeks presented evidence that some of his nine absences were a result of his medical condition, and Mr. Lewis presented evidence that some of his nine absences were a result of a faulty absence-reporting system. These reasons were summarily rejected, while similarly-situated white employees were rehired.

■■■ Finally, even presuming that Mayflower established a nondiscriminatory reason for refusing to hire the appellees, we find no error in the Commission's determination that the reason was, in whole or in part, a pretext for discrimination.

For instance, Mayflower contended that Mr. Cheeks had failed to file his medical leave application within the fifteen-day limit. Mr. Cheeks received the medical leave application on October 25, 2001, and returned it on October 31st. A union representative testified that Mayflower supervisors were "not real sticklers" about the fifteen-day limit. However, Mayflower, during Mr. Cheeks' grievance, falsely represented to the union that Mr. Cheeks had received his application on October 12th or 13th, and did not return the paperwork until November 5th. These false representations impelled the union, lacking any paperwork to disprove Mayflower's representations, to drop Mr. Cheeks' grievance.

Likewise, Mr. Lewis established that the call-in system repeatedly failed to work, and that several of his absences had mistakenly been recorded as "no call, no show" absences. The record suggests that numerous white individuals were forgiven for numerous transgressions of safety and other employment policies, but when Mr. Lewis asked that the human resources director correct his employment record to fix mistakenly-recorded absences, Mr. Lewis was told, "This is the last time I will do anything for you, Sam." Mayflower rejected Mr. Lewis' protests that his employment record was wrong, and now seeks to rely on the fact that the union neglected Mr. Lewis and failed to appeal the denial of his grievance.

The Commission proved pretext by showing that Mayflower knew that Mr. Cheeks had submitted his paperwork by the company's deadline, and knew that he had not violated Mayflower's policy, but represented to the union that he had violated company policy. The Commission proved pretext by showing that Mayflower routinely gave second and third chances to employees with records far worse than Mr. Lewis' employment record, without union involvement, but in Mr. Lewis' case blamed its failure to rehire him on the union's failure to file a grievance appeal. Once it is shown that an employer's reason for an action was pretextual, discrimination may be inferred from the employer's actions. *See supra,* Syllabus Point 5, *Skaggs v. Elk Run Coal Co., Inc.*

We therefore find no error in the Commission's and circuit court's conclusion that appellant Mayflower engaged in unlawful discrimination when it failed to rehire the appellees.

### B.

■■■ Appellant Mayflower's second point of error concerns the calculation of the damages awarded to appellee Cheeks.[16] Mr. Cheeks was terminated in November 2001,

16. Mayflower does not challenge the calculation of damages awarded to Mr. Lewis.

and the Commission ruled that Mr. Cheeks was entitled to damages for back pay from the date of his termination until July 31, 2004.[17]

Mayflower argues that Mr. Cheeks is not entitled to receive any damages subsequent to June 2003. Mayflower explains that at a hearing in September 2003, an attorney for the Commission introduced into evidence a spreadsheet showing that Mr. Cheeks had lost monthly wages from November 2001 through June 2003, and no lost wages for the months of July, August or September 2003. When a decision was initially issued in February 2004, no lost wages were awarded to Mr. Cheeks for the months subsequent to June 2003.

The attorney for the Commission appealed the February 2004 decision, asserting that a clerical error had resulted in the creation of a spreadsheet that accidentally omitted appellee Cheeks' lost wages subsequent to June 2003. The Commission's attorney was then given an opportunity to present additional evidence concerning the entirety of Mr. Cheeks' lost wages. Mayflower apparently made no objection to the Commission attorney's updated, complete damage calculations. In the Commission's final order, on September 10, 2004, based upon the thorough damage calculation, Mr. Cheeks was awarded back wages from the date of his November 2001 termination up to the date of the drafting of the Commission's final order (July 31, 2004), and front pay from that day forward until he is rehired by Mayflower.

After careful consideration of the record, we find no error in the Commission's decision to permit the Commission's attorney to correct the clerical error. Appellant Mayflower raised no objection to the Commission's attorney's revised evidence of damages, and raises no suggestion now why the revised evidence is incorrect. The Commission was within its discretion to permit the parties to clarify the factual record, and the Commission's decision to award Mr. Cheeks back pay for the period from July 2003 until July 2004, based upon a thorough review of a complete record, was properly sustained by the circuit court.[18]

Mayflower's second argument is that Mr. Cheeks should not receive any back-pay damages from November 5, 2001, until July 19, 2002, because it contends that Mr. Cheeks was not discriminated against until Mayflower failed to rehire him pursuant to

**17.** The final order of the Commission, dated September 10, 2004, required Mayflower to pay Mr. Cheeks incidental damages in the amount of $3,277.45 for humiliation, embarrassment, emotional distress and loss of personal dignity; net back pay in the amount of $101,754.88 through July 31, 2004; front pay of $3,347.57 per month until such time as Mayflower reinstated Mr. Cheeks to the next available full-time position; and pre-and post-judgment interest.

**18.** Another argument is raised by appellant Mayflower, one which we find to be thoroughly baffling and difficult to summarize. This argument appears to be based upon the Commission's attorney's use of the spreadsheet that incorrectly showed no lost wages for Mr. Cheeks from July 2003 onward.

In a preliminary February 2004 decision that discussed the incorrectly-prepared spreadsheet, the Commission expressed confusion about why the record did not show any back pay damages for Mr. Cheeks "subsequent to July 2003" [emphasis added]. However, without objection from Mayflower, the Commission's attorney later produced a complete summary of Mr. Cheeks' lost wages, and the Commission's final September 2004 order awarded Mr. Cheeks back pay for the period from July 2003 until July 31, 2004.

In its appellate brief, however, Mayflower quotes the Commission's expression of confusion in the preliminary decision, and based upon that expression argues that the Commission should not have granted back pay to Mr. Cheeks from July 2002 until October 2002. Mayflower further argues that the Commission's final decision to award back pay damages should be reversed because the Commission "realized the inherent problems in awarding back pay to Mr. Cheeks" for this time period. However, two sentences later, in the same paragraph, Mayflower decides that the Commission's decision "was not an abuse of discretion" and that the "back pay award for July 19, 2002 to the end of October 2002 was appropriate."

As best we can determine, Mayflower appears to have spent three pages of its appellate brief arguing that the Commission's initial order of February 2004 should be adopted to the extent it was based on an incomplete evidentiary record, and that the Commission's final order of September 2004 should be reversed to the extent it is based on a thorough review of a complete evidentiary record.

We decline Mayflower's invitation to reach such a result.

union negotiations. Mayflower asserts that after Mr. Cheeks' termination, he began a union grievance process which—Mayflower contends—ultimately ended on July 19, 2002, when his union representative dropped the grievance.

At the outset, we reject Mayflower's assertion that damages began to accrue on July 19, 2002, for a singular reason: we cannot find any mention of that date anywhere in the record. Mayflower's counsel does not cite to any point in the record where this date may be found, and our review of the record has not revealed any documentation or testimony showing this to be the date where Mr. Cheeks' union grievance process came to an end. The latest documentation we can find showing the termination of the union grievance process is a memorandum dated March 13, 2002, denying Mr. Cheeks' level three grievance.[19]

Still, Mayflower is essentially arguing that it should not be forced to pay damages until the date of its last opportunity to rehire Mr. Cheeks.

The Commission responds by pointing out that, using Mayflower's logic, no employer who engaged in discrimination would ever have to pay back wages because, even after union grievances had been exhausted, lawsuits filed and appeals prosecuted, the employer would still have an opportunity to rehire the employee who was a victim of discrimination. The Commission argues that the law does not require an employer to exhaust all of its opportunities to rehire an employee before back wages begin to run, and does not require an employee to exhaust the union grievance process before they are entitled to damages.

We agree, in part, with the Commission's position. Mr. Cheeks' damages began to accrue when discrimination occurred in Mayflower's decision not to rehire him. The law does not require that Mayflower be permitted to exhaust all procedural niceties to delay rehiring an employee before back wages begin to accrue, and does not require an employee to exhaust a union grievance process.

The question that troubles this Court, however, is the specific date that Mr. Cheeks' damages began to accrue. As one court stated:

> The major difficulty in attempting to compute a backpay award in a case such as this one is that the subjectivity of defendant's method of filling job vacancies renders impossible anything like a precise calculation of the pecuniary effects of discrimination. In light of the uncertainty which clouds the task before us, we must set down three general rules: (1) unrealistic exactitude is not required; (2) ambiguities in what an employee or group of employees would have earned but for discrimination should be resolved against the discriminating employer; (3) the district court, far closer to the facts of the case than we can ever be, must be granted wide discretion in resolving ambiguities.

*Stewart v. General Motors Corp.*, 542 F.2d 445, 452 (7th Cir.1976). *In accord, Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260–61 (5th Cir.1974); *United States v. United States Steel Corp.*, 520 F.2d 1043, 1050–55 (5th Cir.1975). *See also Domingo v. New England Fish Co.*, 727 F.2d 1429, 1445 (9th Cir.1984) ("All uncertainties [in calculating a back-pay award] should be resolved against the employer."); *U.S. v. City of Miami*, 195 F.3d 1292, 1299 (11th Cir.1999) ("[W]e have observed that remedial relief does not require " 'unrealistic exactitude,' " and that " 'uncertainties' " in the relief process " 'should be resolved against the discriminating employer.' " ").

It is axiomatic that Mr. Cheeks' damages began to accrue when the unlawful discrimination by Mayflower occurred; the question which has not been fully resolved with clarity by the parties, however, is the date of that

---

**19.** As discussed in the text, *supra*, Mayflower's human resources director stated in the March 13, 2002 memorandum that Mr. Cheeks had violated the company's medical leave policy by turning in a medical leave application twenty two or twenty three days after receiving the application, and not within "the 15 days allowed." This statement was made even though Mayflower's records plainly revealed that Mr. Cheeks returned the application within five or six days of receiving the application.

discrimination. The Commission argues that when Mayflower failed to rehire Mr. Cheeks, even though it was cognizant that he had not violated the company's policy regarding unexcused absences, discrimination occurred.

The Commission did not err in its decision that Mayflower engaged in unlawful discrimination when it refused to rehire Mr. Cheeks. What is not definitively resolved by the record, however, is the approximate or exact date upon which Mayflower engaged in that unlawful discrimination. Mayflower appears to assert that back pay damages for Mr. Cheeks began to accrue when Mayflower refused the union's grievance, and for the last time engaged in unlawful discrimination by refusing to rehire Mr. Cheeks. The Commission asserts that Mayflower possessed the same evidence on November 5, 2001, when it fired Mr. Cheeks as when it denied the grievance on March 13, 2002. The Commission therefore takes the position that because Mayflower could have reversed its termination decision on November 5, 2001, the discrimination occurred on that date.

The record before this Court does not establish when Mayflower's human resources department had in view all of the pieces of the puzzle, could discern that Mr. Cheeks had been improperly discharged, and failed to give Mr. Cheeks the same consideration that was given to white employees. That date might be the day Mr. Cheeks was terminated on November 5, 2001; the day Mr. Cheeks filed his initial grievance; some point in the grievance process; the day the human resources director drafted her March 13, 2002 memorandum denying the grievance after reviewing Mr. Cheeks' employment record; or some other date.

Accordingly, we reverse, in part, the circuit court's order regarding Mr. Cheeks, and remand this case to the circuit court for factual reconsideration of the date that unlawful discrimination by appellant Mayflower occurred, and thereby the date that Mr. Cheeks' back pay damages began to accrue.

### IV.

After careful consideration of the extensive factual record developed below, we affirm the Commission's and circuit court's determinations that unlawful discrimination occurred in appellant Mayflower's decision not to rehire appellees Cheeks and Lewis.

However, we reverse the Commission's and circuit court's back pay award to appellee Cheeks, and remand the case to the circuit court for a factual determination of the proper date that unlawful discrimination against appellee Cheeks occurred, and thereby the date appellee Cheeks' back pay award began to accrue.

Affirmed, in part, Reversed, in part, and Remanded.