696 S.E.2d 282

**FORD MOTOR CREDIT COMPANY, Respondent Below, Appellant,**

v.

**WEST VIRGINIA HUMAN RIGHTS COMMISSION and Nabil Akl, Petitioners Below, Appellees.**

No. 35301.

Supreme Court of Appeals of West Virginia.

Submitted April 14, 2010.

Decided May 5, 2010.

Robert D. Fisher, Adams, Fisher & Chappel, PLLC, Ripley, WV, Charlie J. Harris, Jr., Julia D. Kitsmiller, Pro Hac Vice, Seyferth Blumenthal & Harris, LLC, Kansas City, MO, for Appellant, Ford Motor Credit Company.

Andrew J. Katz, The Katz Working Families Law Firm, Charleston, WV, for Appellee Mr. Akl.

PER CURIAM:

This is an appeal by Ford Motor Credit Company, appellant/respondent below (hereinafter referred to as "Ford Motor"), from a decision of the West Virginia Human Rights Commission (hereinafter referred to as "the HRC") that affirmed the decision of an Administrative Law Judge (hereinafter referred to as "ALJ") awarding a judgment in favor of Nabil Akl, appellee/petitioner below (hereinafter referred to as "Mr. Akl"). In this appeal, Ford Motor Company contends that it was error for the HRC to affirm the ALJ's determination that Mr. Akl established a claim for disparate treatment, hostile work environment, and constructive discharge. After a careful review of the briefs, the record submitted on appeal, and listening to the arguments of the parties, we reverse.[1]

## I.

### FACTUAL AND PROCEDURAL HISTORY

Mr. Akl is a United States citizen. He was born in Lebanon in 1967. In 1976, Mr. Akl immigrated to the United States with his family. In 1998, Mr. Akl was hired by Ford Motor as a Customer Service Representative for its North Atlanta Branch office.[2] Subsequently, Mr. Akl was relocated to offices in Nashville and Kansas City. In February 2005, Ford Motor relocated Mr. Akl to Huntington, West Virginia, and promoted him to the position of Dealer Services Supervisor.[3] While at the Huntington office, Mr. Akl and another employee, Carmine Spada, supervised approximately twelve other employees.

In early September 2005, Ford Motor conducted an online anonymous personnel survey at the Huntington office.[4] The survey

was designed to determine the level of employee job satisfaction with management practices and the implementation of company policies and procedures. The survey result demonstrated a high level of employee dissatisfaction at the Huntington office. As a result of the negative feedback from the survey, Ford Motor sent two of its human resource personnel, DeAnne Griffore and Emma Loy, to the Huntington office to conduct an on-site investigation into employee dissatisfaction at the office.

Ms. Griffore and Ms. Loy conducted interviews with employees at the Huntington office. During the interviews, nine of the employees stated that Mr. Akl used offensive language at the office. Some of the comments attributed to Mr. Akl include: "all I need is another damn woman telling me what to do;" "kiss my balls;" "who's sucking your dick now;" "you must have the balls the size of raisins;" telling a co-worker "you need to do it because its [sic] your fucking job;" making homosexual jokes; and imitating mentally challenged people. The branch operations manager at the Huntington office, David MacDonald, informed Ms. Griffore and Ms. Loy that he had advised Mr. Akl on three separate occasions that he should not use profanity while at the office. Specifically, Mr. MacDonald stated that he spoke with Mr. Akl about his inappropriate language in April, July, and August of 2005. Mr. MacDonald further stated that he placed a jar on Mr. Akl's desk for the purpose of having him place a coin in the jar whenever he used profanity at the office. Mr. MacDonald indicated that this "swear jar" was solely for Mr. Akl because no other employee exhibited a problem with inappropriate language.

After Ms. Griffore and Ms. Loy completed their interviews, they met with Mr. Akl on September 13, 2005. At that meeting, the following memorialized exchange occurred between Ms. Loy, Ms. Griffore, and Mr. Akl:

---

**1.** There were other issues raised by Ford Motor, but we need not resolve those matters in light of our resolution of the three issues addressed.

**2.** The order of the ALJ states that Ford Motor "is in the business of acquiring credit, approving credit and providing credit packages to the Ford dealerships."

**3.** The record indicates Mr. Akl received several nonsupervisor promotions prior to being sent to Huntington.

**4.** Ford Motor conducts the surveys at all of its branch offices.

Ms. Loy: It has been brought to our attention that there has been some inappropriate behavior on your part. I'm going to provide the allegations and I would like your response to each of them. It has been alleged that you use the "f" word in regular conversation on a regular basis.

Mr. Akl: That is an exaggeration. I don't say it all the time. I say a lot of things with dealers—get wrapped up in their environment. It was mentioned to me way back and I've tried to improve. Dave (MacDonald) told me to be careful what I say on the floor and watch my language.

Ms. Loy: Are you aware of the company policy on proper conduct and how we treat and talk to employees?

Mr. Akl: I haven't read the policy but it makes sense that you wouldn't cuss like a sailor.

Ms. Loy: Tell us about the swear jar. How did that come about and why?

Mr. Akl: It's for using any words that we shouldn't, more than just swear. You put a quarter in if you say damn. Dave brought it out to help as a reminder of where we're at and what we are saying.

Ms. Loy: It has been alleged that you engage in banter with another employee making comments to the effect of "who is sucking your dick?", "did they hit their head on the way out from under your desk?", and general comments inferring sexual connotation.

Mr. Akl: That first comment is over the top—I would not say that. I don't remember saying those things.

Ms. Loy: Did you make any reference to blow jobs?

Mr. Akl: I don't think I would have said that.

Ms. Loy: It has been alleged that you've made comments on or after phone calls to the effect of "you can kiss my balls" and "fuck him".

Mr. Akl: I could see saying that ("fuck him"). I might have said some things but I don't remember saying that ("kiss my balls").

Ms. Loy: It has been alleged that on one occasion you made a disparaging comment toward women to the effect of "just what I need, another damn woman telling me what to do".

Mr. Akl: No. I didn't say that. My boss is female and I get along.

Ms. Loy: There has been an allegation that you have indicated that if people go to the BM (Branch Manager) with concerns that it may look bad on their PR (personnel record).

Mr. Akl: I know where that conversation came from. I can tell you. I was trying to coach Kitty off the record about the boss overhearing her bitching. I just wanted to let her know that he isn't in the office that much so you don't want his impression to be of her bitching. It wasn't a performance issue.

Ms. Loy: First I want to clarify that I cannot state where the allegation came from and although it is tempting to try to figure out who said what, don't go there.

Mr. Akl: I just mentioned it because I know that exact conversation.

Ms. Loy: Given what you've described to me, I need to ask, did you use the word bitching when you discussed this with her? I'm just trying to clarify based on your description what words you actually used with her.

Mr. Akl: I probably said complaining.

Ms. Loy: Do you realize that when you are a supervisor and talk to an employee that it is never off the record and that using bitching in conversation with an employee is inappropriate?

Mr. Akl: (nodded)

Ms. Loy: It has been alleged that you have spoken negatively about co-workers to the effect of referring to one as a lazy bastard in front of other employees.

Mr. Akl: I wouldn't talk about my employees that way in front of others.

Ms. Loy: What about co-workers?

Mr. Akl: It could be something to do with integration issues with Carmine (Spada). I didn't call him a name.

Ms. Loy: We touched on this earlier but I need to ask again, what is your understanding about company policy on inappropriate language?

Mr. Akl: I haven't read the policy, but it is just common sense to use professional language. Sometimes after some frustrating calls, not very often, I may swear. Credit is different. The dealers have a totally different environment from corporate America. They say things and jokes and you get involved in the call and forget who can hear. Credit department should be located farther away from the rest of the office.

Ms. Loy: Do you see this behavior by other employees?

Mr. Akl: Yes, others on occasion say things after a bad call.

Ms. Loy: Do you understand that you can address a dealer's comments and that even if they say things that you should not respond like that?

Mr. Akl: (nodded)

Ms. Loy: Did Dave ever talk to you about the consequences of the behavior?

Mr. Akl: No, it didn't get that far. He spoke to me about being professional and to watch what I say.

Ms. Griffore: Has Kirk (Staggs) made inappropriate comments?

Mr. Akl: He cuts up with me. We had to get used to working together as supervisor and employee, although he doesn't report directly to me, rather than friend to friend. We had a conversation one day at lunch that we probably need to watch it, it probably wouldn't look good and we need to be more professional and less like buddies.

Ms. Griffore: Can you give me an example of how you "cut up"?

Mr. Akl: At work or outside? I don't want to speak to outside work.

Ms. Griffore: In the office.

Mr. Akl: No, I'm not offended. (nonresponsive)

Ms. Griffore: You can't give any examples?

Mr. Akl: No.

Once the interview with Mr. Akl was completed, he was informed that he was suspended pending a decision on the investigation. Mr. Akl was also told that he would have one week to provide a written statement regarding the allegations against him. Mr. Akl did not submit a written statement. Ms. Griffore and Ms. Loy turned over their investigative report to Ford Motor. Based upon the report, Ford Motor made the decision to reprimand and demote Mr. Akl.

On September 27, 2005, the branch manager of the Huntington office, Dave Nicosia, met with Mr. Akl to inform him of Ford Motor's decision. A human resource manager for Ford Motor, Jeffrey Godlewski, was part of the meeting via telephone conferencing. The meeting lasted approximately five minutes. During the meeting, Mr. Akl was given a letter that informed him that he was being reprimanded and demoted. The relevant parts of the letter read as follows:

Subject: Letter of Reprimand—Abusive Language and Verbal Harassment

This letter of reprimand and accompanying demotion to a non-supervisory salary grade 05 is prompted by your abusive language and verbal harassment.

It has come to our attention that you regularly used profanity and made vulgar statements while on the operations floor. In addition you engaged in lewd conversations and jokes which included sexually explicit comments. You also used this type of language in a threatening manner when speaking to the employees that you supervise. You have been counseled on three separate occasions regarding the inappropriateness of these comments. When questioned about this matter you admitted to using profanity and confirmed that you had been counseled on this inappropriate behavior on several occasions.

Your actions violate the Company's Anti–Harassment policy and are unacceptable behaviors especially for one in a supervisory position. Therefore, you are being immediately removed from your supervisory duties. You will be reassigned as a salary grade 5 DSA. Recurrence of this or any similar behavior will result in

further discipline up to and including termination.

This letter will remain in your Personnel Jacket for a period of two years from the date of issuance provided no similar misconduct occurs.[5]

(Footnote added). Mr. Akl was asked to sign the letter of reprimand and demotion. He refused.[6] Mr. Akl also denied that he had been previously counseled about his language on three occasions.[7]

A few hours after receiving the letter of reprimand and demotion, Mr. Akl contacted Ms. Loy by telephone. According to Ms. Loy, Mr. Akl complained that the disciplinary process was not fair and that he had been a victim of derogatory ethnic comments during his employment at the Huntington office. Ms. Loy informed Mr. Akl that any complaints he had about the discipline could be challenged through Ford Motor's Peer Review process. Ms. Loy also informed Mr. Akl that someone would contact him regarding his allegations of ethnic discrimination.

On September 28, 2005, the day after Mr. Akl made allegations of ethnic discrimination, two human resource employees for Ford Motor, Mary Meister and Jeffrey Godlewski, contacted Mr. Akl by telephone. Ms. Meister and Mr. Godlewski informed Mr. Akl that the telephone call was made to discuss the allegations of ethnic discrimination he made to Ms. Loy. However, Mr. Akl indicated that he wanted to discuss his reprimand and demotion. Mr. Akl was informed that issues involved with the disciplinary action taken against him should be addressed to the Personnel Relations Manager. Mr. Akl informed Ms. Meister and Mr. Godlewski that derogatory ethnic jokes were made to him by co-workers and dealership clients. Mr. Akl was asked to be specific by giving details regarding who made the derogatory remarks and when they occurred. Mr. Akl stated that he would provide such information if it would change the discipline he received. After being told that his allegations of ethnic discrimination would not alter the disciplinary action against him, Mr. Akl refused to provide detailed information. Further, Mr. Akl informed Ms. Meister and Mr. Godlewski that he was going to resign. The next day, September 29, Mr. Akl resigned.

In February 2006, Mr. Akl filed an employment discrimination complaint, which

---

5. It should be noted that Ford Motor had an Anti–Harassment—Zero Tolerance policy which included the following pertinent language:

The Company expects its employees to be mindful of the following responsibilities as we collectively strive for a respectful, professional, harassment-free work environment.
**Employee Responsibilities**
• Refrain from making jokes and using language which may be offensive to others (including profanity)
• Discourage others from engaging in such behavior
• Refuse to participate in activities which promote or encourage conduct which may be offensive to others
....
• Report all potential violations of harassment, discrimination, retaliation to the appropriate Human Resources personnel or through the Company's hotline at (888) 735–6650
....
**Violations of the Zero–Tolerance—Anti–Harassment Directive**
Employees who violate this Directive will be subject to discipline up to and including termination, even for the first violation.

6. It should be noted that, in spite of the reprimand and demotion, Mr. Akl's salary and other benefits were not affected.

7. On the same date that Mr. Akl was given the letter of reprimand and demotion, his immediate supervisor, David MacDonald, was also given a letter of reprimand. Mr. MacDonald's letter of reprimand stated the following:

A recent investigation revealed that Nabil Akl regularly used profanity, made vulgar statements and engaged in lewd conversations and jokes which included sexually explicit comments while on the operations floor. When questioned regarding these incidents, you admitted you were aware of some of these violations and provided specific examples of the inappropriate behavior.
You confirmed that you informally counseled Mr. Akl on at least three occasions regarding his inappropriate behavior. However, you did not take any further action, nor informed Human Resources, Personnel Relations, or Regional Management about this issue.
As a Manager, you have the responsibility to ensure that violations of Company policy are handled properly and in a timely fashion. Your failure to properly address Mr. Akl's violations of Company policy is not justified.
This letter will remain in your Personnel Jacket for a period of two years from the date of issuance provided no similar misconduct occurs.

was subsequently amended, with the HRC. The amended complaint alleged causes of action for disparate treatment, hostile work environment, and constructive discharge. The ALJ assigned to the case held evidentiary hearings in the matter in February and June of 2008. During those hearings, Mr. Akl testified that he occasionally used profanity at work, but that other employees, including management staff, also used profanity at work. Mr. Akl additionally testified that management staff, other employees, and dealership clients subjected him to derogatory ethnic comments regularly. Mr. Akl testified further that he believed he would still be subject to derogatory ethnic comments if he continued working for Ford Motor. Mr. Akl also testified that he never reported being the victim of derogatory ethnic comments until after he was reprimanded and demoted. Mr. Akl called one fact witness, Kirk Staggs,[8] during the hearings.[9] Mr. Staggs testified that Mr. Akl did occasionally use profanity at the office, but that other workers also used profanity. Mr. Staggs also testified that he had heard the branch operations manager, Mr. MacDonald, refer to Mr. Akl as "towel head," "al Qaeda," and "camel fornicator." Mr. Staggs further testified that other employees at the office would direct such comments at Mr. Akl. Mr. Staggs additionally stated that he, too, occasionally used profanity at the office, and that Mr. MacDonald required him to place a coin in the "swear jar" whenever he cursed.

Ford Motor called ten witnesses during the hearings. Mr. MacDonald testified that he informally counseled Mr. Akl on three occasions about his use of profanity, and that he had not heard other employees use profanity. Mr. MacDonald denied requiring Mr. Staggs to place coins in the "swear jar." Mr. MacDonald also testified that he never heard anyone direct derogatory ethnic comments at Mr. Akl. The branch manager at the Huntington office, Mr. Nicosia, testified that he never heard anyone making derogatory ethnic comments toward Mr. Akl. Ms. Meister

and Mr. Godlewski testified that they conducted an interview with Mr. Akl regarding his claim of being the victim of derogatory ethnic comments, and that Mr. Akl refused to identify anyone making such comments or any instance of when such comments were made. Ms. Loy and Ms. Griffore testified that nine employees reported that Mr. Akl used profanity and other inappropriate comments in the office.

Three nonsupervisor employees, Bradley Kucik, Tracey Davidson, and Katherine Herrington, and one supervisor employee, Carmine Spada, testified to hearing Mr. Akl use profanity and other inappropriate comments at the office. Mr. Kucik testified that Mr. Akl used profanity "[d]aily, if not hourly," and that he never heard anyone make derogatory ethnic comments to Mr. Akl. Mr. Kucik also stated that he may have on rare occasions heard other managers use profanity. Mr. Kucik further testified that, in 2002, he was demoted from a supervisor position by Ford Motor.[10] Ms. Davidson testified that Mr. Akl regularly used profanity in the office, and that she often heard Mr. Akl and Mr. Staggs engage in vulgar conversations. Ms. Davidson testified specifically that she heard Mr. Akl say " 'kiss my balls' but on— on occasion—numerous, actually numerous times, I would hear him call people pussy." Ms. Davidson denied ever hearing anyone making derogatory ethnic remarks to Mr. Akl. Ms. Herrington testified that Mr. Akl regularly used profanity in the office. Ms. Herrington testified that Mr. Akl told her that she "needed to quit bitching because it's not looked upon professionally or positively by upper management." Ms. Herrington also stated that she once heard Mr. Akl tell an employee "you have to do it cause it's your fucking job." Ms. Herrington denied having heard other managers use profanity. Ms. Herrington indicated that she heard Mr. Akl and Mr. Staggs engage in vulgar conversations. It was also stated by Ms. Herrington that she once heard Mr. Akl state that "that's what you get for having women work-

---

**8.** Mr. Staggs and Mr. Akl knew each other before Mr. Akl came to the Huntington office. Mr. Akl was one of the "best men" at Mr. Staggs' wedding.

**9.** Mr. Akl also called two expert witnesses to testify on the issue of damages.

**10.** There was no testimony as to the reason for the demotion.

ing for you." Ms. Herrington also testified that she was forced to undergo counseling therapy because of the abusive and intimidating atmosphere Mr. Akl created in the office. Mr. Spada testified that he heard Mr. Akl use profanity at the office. Mr. Spada also stated that he had "heard Mr. MacDonald say the 'S' word under his breath or maybe, you know, in his office, but never the 'F' word." Mr. Spada testified further that Mr. Staggs and Ms. Herrington came to him several times complaining about Mr. Akl's abusive conduct as a supervisor. Mr. Spada stated that he conveyed the complaints to Mr. MacDonald. It was further stated by Mr. Spada that he never heard anyone make derogatory ethnic remarks to Mr. Akl.

At the conclusion of the hearings, the ALJ issued a final order on March 25, 2009, which found that Mr. Akl had proven his claims of disparate treatment, hostile work environment, and constructive discharge.[11] The ALJ awarded Mr. Akl $5,000.00 for incidental damages: $624,654.00 in lost earnings: and $31,250.00 in costs and attorney's fees. Ford Motor appealed the decision to the HRC. By order entered July 9, 2009, the HRC affirmed the decision of the ALJ. This appeal followed.

## II.

## STANDARD OF REVIEW

This case presents an appeal from an order of the HRC affirming the decision of the ALJ. We have held that

> [w]here an appeal from an order issued by the West Virginia Human Rights Commission is brought directly to the West Virginia Supreme Court of Appeals, pursuant to W. Va.Code § 5–11–11 (1989), this Court will apply the same standard of review that is applied to Human Rights

Commission orders appealed to a circuit court.

Syl. pt. 1, *Cobb v. West Virginia Human Rights Comm'n*, 217 W.Va. 761, 619 S.E.2d 274 (2005). The standard of review has been stated as follows:

> This Court is bound by the statutory standards contained in W. Va.Code § 29A–5–4(a) and reviews questions of law presented *de novo;* findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.

Syl. pt. 2, *Erps v. West Virginia Human Rights Comm'n*, 224 W.Va. 126, 680 S.E.2d 371 (2009) (citing Syl. pt. 1, in part, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996)). With these standards in place, we will review the issues presented by this appeal.

## III.

## DISCUSSION

In this case we are asked to determine whether the evidence supported the HRC's determination that the ALJ was correct in finding that Mr. Akl was entitled to judgment in his favor on his claims of disparate treatment, hostile work environment, and constructive discharge. We will carry out this task by reviewing each claim for relief separately.

### A. Disparate Treatment

Mr. Akl contends that the evidence proved that he was demoted because of his national origin, *i.e.*, because he was of Lebanese descent. Ford Motor contends that the evidence established that Mr. Akl was demoted solely because he violated its policy prohibiting the use of foul and abusive language in the workplace.

---

**11.** After the hearing had concluded, but before the final decision was rendered, Mr. Staggs contacted the ALJ and stated that his testimony was given under intimidation by Ford Motor and its counsel. It appears that Mr. Staggs was terminated, for reasons not indicated in the record, by Ford Motor at some point after the hearings. However, prior to the termination, it appears Ford Motor had actually promoted Mr. Staggs. The ALJ allowed the case to be reopened to take

further testimony from Mr. Staggs. The parties indicate that this testimony was memorialized in the record as Volumes VII and VIII. However, the record on appeal does not contain Volume VIII. Insofar as the ALJ's final order did not expressly rely upon matters brought out in Mr. Staggs' post-hearings testimony, we will not address issues raised by Ford Motor concerning the post-hearings testimony.

■ Under the West Virginia Human Rights Act, W. Va.Code § 5–11–1, *et seq.*, it is unlawful "[f]or any employer to discriminate against an individual with respect to ... tenure, terms, conditions or privileges of employment[.]" W. Va.Code § 5–11–9(1) (1998) (Repl. Vol.2006). Under the Act, "[t]he term 'discriminate' or 'discrimination' means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, sex, age, blindness, disability or familial status and includes to separate or segregate[.]" W. Va.Code § 5–11–3(h) (1998) (Repl. Vol.2006). A claim for national origin employment discrimination may be brought as a cause of action for disparate treatment.[12] In the instant case, the ALJ's order, which was adopted by the HRC, concluded that Mr. Akl established a claim for "disparate treatment in his demotion from supervisory responsibility[.]" We disagree.

This Court has recognized that, "[u]nder the Human Rights Act, ... a claim of [employment] discrimination is governed by the familiar three-step evidentiary framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668, 677–79 (1973), and *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)." *Moore v. Consolidation Coal Co.*, 211 W.Va. 651, 656, 567 S.E.2d 661, 666 (2002). The *McDonnell Douglas/Burdine* three-step evidentiary framework was adopted by this Court as follows:

In an action to redress unlawful discriminatory practices in employment ... the burden is upon the complainant to prove by a preponderance of the evidence a prima facie case of discrimination[.] If the complainant is successful in creating this

rebuttable presumption of discrimination, the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination.

Syl. pt. 3, in part, *Shepherdstown Volunteer Fire Dep't. v. State ex rel. State of West Virginia Human Rights Comm'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983). *See also* Syl. pt. 3, *Mayflower Vehicle Sys., Inc. v. Cheeks*, 218 W.Va. 703, 629 S.E.2d 762 (2006).

■ We have "previously formulated a general test for a prima facie case of disparate-treatment employment discrimination, and that test is applicable to a case, such as this one, involving an employment-related decision made allegedly because of a complaint's national origin." *West Virginia Inst. of Tech. v. West Virginia Human Rights Comm'n*, 181 W.Va. 525, 529, 383 S.E.2d 490, 494 (1989):

In order to make a prima facie case of [disparate-treatment] employment discrimination under the West Virginia Human Rights Act, W. Va.Code § 5–11–1 [to 5–11–19, as amended], the plaintiff must offer proof of the following: (1) That the plaintiff is a member of a protected class. (2) That the employer made an adverse decision concerning the plaintiff. (3) But for the plaintiff's protected status, the adverse decision would not have been made. Syl. pt. 3, *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986).

12. This Court has previously noted that
[t]here are two theories of employment discrimination, the disparate impact theory and the disparate treatment theory. The first theory focuses on the discriminatory effect of the employer's acts, the second on the discriminatory motive of the employer. More specifically, the disparate impact theory is invoked to attack facially neutral policies which, although applied evenly, impact more heavily on a protected group. Under the disparate treatment theory, the complainant must show that the

employer treats some people less favorably than others because they belong to a protected class. Thus, a complainant asserting a disparate treatment theory must prove discriminatory intent to prevail, while a complainant asserting a disparate impact theory need not offer any such proof.
*Morris Mem'l Convalescent Nursing Home, Inc. v. West Virginia Human Rights Comm'n*, 189 W.Va. 314, 317, 431 S.E.2d 353, 356 (1993) (citations and internal quotations omitted).

Syl. pt. 1, *West Virginia Inst. of Tech., id.* We have recognized that " '[t]he burden of establishing a prima facie case of disparate treatment is not onerous.' " *Morris Mem'l Convalescent Nursing Home, Inc. v. West Virginia Human Rights Comm'n,* 189 W.Va. 314, 317, 431 S.E.2d 353, 356 (1993) (quoting *Texas Department of Comty. Affairs v. Burdine,* 450 U.S. 248, 252–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207, 215 (1981)).

■ In the instant case, Mr. Akl presented evidence showing that his national origin, Lebanon, placed him in a protected class under the Act. Mr. Akl also presented undisputed evidence that Ford Motor made an adverse employment decision against him for using profanity and other inappropriate comments at work. In order to satisfy the third element of a prima facie case, Mr. Akl presented evidence alleging that other, non-Lebanese, employees used profanity at the workplace but were not disciplined. Although we find the evidence concerning other employees to be slight, at best, it was sufficient to create a rebuttable presumption of discrimination.

■ We have held that "[t]he complainant's prima facie case of disparate-treatment employment discrimination can be rebutted by the employer's presentation of evidence showing a legitimate and nondiscriminatory reason for the employment-related decision in question which is sufficient to overcome the inference of discriminatory intent." Syl. pt. 2, *West Virginia Inst. of Tech.,* 181 W.Va. 525, 383 S.E.2d 490. In this case, Ford Motor presented evidence that it had a policy in place that prohibited the use of foul and abusive language in the workplace. Under this policy, an employee could be terminated for using foul and abusive language in the workplace. Ford Motor presented evidence that it conducted an investigation of its Huntington office because it received complaints from employees during a routine anonymous personnel audit. The investigation revealed that nine employees stated that Mr. Akl used foul and abusive language in the office. When Mr. Akl was confronted with the alle-

gations, he admitted to some of the accusations, denied some, and could not remember others. Although one of the investigators, Ms. Loy, recommended firing Mr. Akl, Ford Motor decided to merely reprimand and demote him. We believe the evidence by Ford Motor of a legitimate and nondiscriminatory reason to demote Mr. Akl was sufficient to rebut the prima facie showing of disparate treatment.

■ The fact that Ford Motor established a legitimate and nondiscriminatory reason for demoting Mr. Akl does not end our inquiry. We have held that "[t]he complainant will still prevail in a disparate-treatment employment discrimination case if the complainant shows by the preponderance of the evidence that the facially legitimate reason given by the employer for the employment-related decision is merely a pretext for a discriminatory motive." Syl. pt. 3, *West Virginia Institute of Technology.* The only evidence that Mr. Akl presented to challenge Ford Motor's legitimate and nondiscriminatory reason for demoting him, involved allegations that other employees used profanity at the office, but were not disciplined. We do not find that the de minimis evidence of others using profanity proved that Ford Motor's legitimate and nondiscriminatory reason for demoting Mr. Akl was pretextual.

The evidence is clear in showing that, during the investigation at the Huntington office, only one supervisor was accused of using profanity and abusive language routinely. That supervisor was Mr. Akl. Further, at the time of the investigation, only one employee, Mr. Staggs, suggested that others used profanity at the office.[13] Thus, at the point when disciplinary action was taken against Mr. Akl, Ford Motor had not received any complaint of the use of profanity and abusive language by any other employee at the Huntington office.

■ During the actual trial, Mr. Staggs testified that other employees used profanity at the office. Mr. Spada testified during the trial that he once heard the operations

---

13. Mr. Staggs told Ms. Loy that:
   Well, we don't use that language on a regular basis, but one of us might hang up the

phone and say something like, "that guy was a real ass!" That's not just Nabil, almost all of us in Credit have done that.

branch manager, Mr. MacDonald, use the word "shit" in a low voice. Mr. Kucik testified at trial that he may have on rare occasions heard other managers use profanity. We do not believe that the pre-disciplinary investigatory evidence and the trial evidence of rare use of profanity by other employees, established that Ford Motor's legitimate and nondiscriminatory reason for demoting Mr. Akl was pretextual. "[O]nce an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity[.]" *Hux v. City of Newport News,* 451 F.3d 311, 315 (4th Cir.2006). That is, it was "incumbent on [Mr. Akl] to present more than a scintilla of evidence that [Ford Motor's] reason for the adverse employment action of which [he] complains was a pretext for unlawful discrimination." *Ptomey v. Texas Tech Univ.,* 277 S.W.3d 487, 493–94 (Tex.Ct. App.2009). This is true particularly in light of the fact that Ford Motor presented evidence that "a supervisor at [its] Irving Business Center was demoted … for inappropriate comments toward a subordinate." Additionally, Ford Motor presented testimony that, at its office in Cleveland, Ohio, "the top person in charge, the Branch Manager, was fired, terminated, for his language. For improper leadership, he had a problem cursing." Finally, there was also evidence that another employee working in the Huntington office, Mr. Kucik, had been demoted from a supervisor position in 2002.

Consequently, we find that the HRC was clearly wrong in finding that Mr. Akl proved his claim for disparate treatment involving his demotion.

### B. Hostile Work Environment

■ Mr. Akl contends that the evidence proved that he was subjected to a hostile work environment. According to Mr. Akl, the employees at the Huntington office frequently referred to him using ethnically derogatory comments, such as "towel head," "al Qaeda," and "camel fornicator." The ALJ found that Mr. Akl proved his claim for hostile work environment because Ford Motor "fail[ed] to take appropriate actions in response to the ethnic harassment." We disagree. To begin, this Court has held that,

> [t]o establish a claim for [national origin] discrimination, under the West Virginia Human Rights Act, West Virginia Code §§ 5–11–1 to –20 (1999) based upon a hostile or abusive work environment, a plaintiff-employee must prove that: (1) that the subject conduct was unwelcome; (2) it was based on the [national origin] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment; and (4) it was imputable on some factual basis to the employer.

Syl. pt. 2, *Fairmont Specialty Servs. v. West Virginia Human Rights Comm'n,* 206 W.Va. 86, 522 S.E.2d 180 (1999). This Court has addressed the requirements of the first prong of the *Fairmont Specialty* criteria as follows:

> In order to constitute harassment and satisfy the first prong of a hostile work environment claim as set forth in syllabus point 2 of *Fairmont Specialty Services v. West Virginia Human Rights Commission,* 206 W.Va. 86, 522 S.E.2d 180 (1999), the subject conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive.

Syl. pt. 5, *Erps v. West Virginia Human Rights Comm'n,* 224 W.Va. 126, 680 S.E.2d 371 (2009). We also held in *Erps* that:

> When a plaintiff bringing a hostile work environment claim pursuant to the standards enunciated in syllabus point 2 of *Fairmont Specialty Services v. West Virginia Human Rights Commission,* 206 W.Va. 86, 522 S.E.2d 180 (1999), has solicited, incited or participated in the subject offensive conduct, the plaintiff must introduce evidence indicating (1) that he or she ultimately informed the involved co-workers and/or supervisors that future instances of such conduct would be unwelcome, and (2) that conduct thereafter continued. Where such evidence is produced, a question of fact is created as to whether or not the conduct was unwelcome.

Syl. pt. 6, *Erps, id.*

■ In the instant case, the evidence is clear that Mr. Akl failed to establish that the

ethnic comments he now complains of were unwelcome. During the hearings, Mr. Akl testified that employees at the Huntington office engaged in "teasing and bantering," and that he took part in the same. In the amended complaint filed by Mr. Akl he unequivocally stated that, "[d]uring the period of my employment with [Ford Motor], my colleagues and I often engaged in a certain amount of 'teasing banter.'" There was also testimony by Mr. Staggs that Mr. Akl participated in the office "teasing and bantering." As we said in *Erps*, "[w]here a plaintiff has ... participated in the offensive conduct without complaint, a claim based upon an allegation of a hostile work environment will ordinarily fail." *Erps*, 224 W.Va. at 136, 680 S.E.2d at 381.

■ Assuming, for the sake of argument, that Mr. Akl did not participate in the office teasing and bantering, but was simply a victim of the same, the evidence in this case did not satisfy the last prong of the criteria under *Fairmont Specialty*. That is, there was insufficient evidence to impute knowledge of the derogatory remarks to Ford Motor.

Mr. Akl testified that he *never* complained about the ethnic teasing that he was subjected to until after he was demoted. *See Fairmont Specialty Servs.*, 206 W.Va. at 99, 522 S.E.2d at 193 (Davis, J., dissenting) ("Unless the employer had reason to know of the conduct and ignored acting upon such information, the investigatory process required by law does not begin until a complaint has been made."). Contrary to the ALJ's finding, the evidence clearly showed that, when Mr. Akl informed Ms. Loy that he was an alleged victim of derogatory ethnic comments, Ms. Loy immediately contacted Ms. Meister and Mr. Godlewski and informed them of the allegations. Ms. Meister and Mr. Godlewski contacted Mr. Akl the day after he made the allegations and attempted to conduct an investigation into the matter. However, Mr. Akl refused to discuss any details about his allegations if he could not have his demotion set aside. Ms. Meister and Mr. Godlewski informed Mr. Akl that he had to contact the Personnel Relations Manager to challenge the demotion. Rather than challenging the

demotion through Ford Motor's internal process and proceed with the investigation of the allegations he made, Mr. Akl chose not to reveal details of his allegations and resigned from work. Mr. Akl's resignation and failure to cooperate in a discrimination investigation that he initiated precludes imputing the alleged conduct to Ford Motor. *See Erps*, 224 W.Va. at 139 n. 17, 680 S.E.2d at 384 n. 17 (discussing the ramifications of an employee's failure to allow employer an opportunity to investigate and remedy allegations of racially derogatory remarks).

Thus, we find that the HRC was clearly wrong in finding that Mr. Akl proved his claim for hostile work environment.

### C. Constructive Discharge

■ Mr. Akl asserted that the evidence proved that he was constructively discharged from his employment. According to Mr. Akl, the evidence established that, because Ford Motor failed to address his complaint regarding ethnic derogatory comments, he was forced to resign from his employment. The ALJ found that Mr. Akl "was constructively discharged from his employment with [Ford Motor], given the demotion and its effects upon the conditions which he would have had to endure, to continue his employment with [Ford Motor]." We reject Mr. Akl's contentions and the ALJ's convoluted and nonresponsive conclusion.

■ "We have recognized that a constructive discharge can result where an employee has been forced to resign by improper actions of an employer." *Birthisel v. Tri–Cities Health Servs. Corp.*, 188 W.Va. 371, 375 n. 6, 424 S.E.2d 606, 610 n. 6 (1992). This Court has held that "[a] constructive discharge cause of action arises when the employee claims that because of age, race, sexual, [national origin,] or other unlawful discrimination, the employer has created a hostile working climate which was so intolerable that the employee was forced to leave his or her employment." Syl. pt. 4, *Slack v. Kanawha County Hous. & Redevelopment Auth.*, 188 W.Va. 144, 423 S.E.2d 547 (1992). *Slack* also stated:

In order to prove a constructive discharge, a plaintiff must establish that

working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with a specific intent to cause the plaintiff to quit.

Syl. pt. 6, *Slack, id.* Finally, we have held that "[a]n employer will not be liable for discriminatory acts of its employee unless he knew or reasonably should have known of the discriminatory acts and did nothing to correct them, or expressly or impliedly authorized or ratified them." Syl. pt. 8, *Paxton v. Crabtree,* 184 W.Va. 237, 400 S.E.2d 245 (1990).

In the instant proceeding, Mr. Akl's constructive discharge claim fails for the same reasons that his hostile work environment claim failed. That is, the evidence clearly established that when Mr. Akl first brought to the attention of Ford Motor that he was allegedly the victim of derogatory ethnic comments, Ford Motor immediately began an investigation. The evidence was equally uncontradicted that Mr. Akl refused to cooperate with Ford Motor in conducting an investigation of his allegations and chose, instead, to resign.

■■■ An employee cannot sustain a cause of action for constructive discharge when he/she intentionally denies the employer an opportunity to remedy the problems the employee contends led to a constructive discharge. *See West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir.1995) ("An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged."); *Jones v. Forrest City Grocery Inc.,* 564 F.Supp.2d 863, 868 (E.D.Ark.2008) ("To be reasonable, an employee must give the employer a reasonable opportunity to correct the problem. In other words, a plaintiff must take affirmative steps short of resigning that a reasonable employee would take to make the conditions of employment more tolerable."); *Garone v. United Parcel Serv., Inc.,* 436 F.Supp.2d 448, 465 (E.D.N.Y.2006) ("Where an employer immediately begins an investigation upon being made aware of employee's [discrimination] complaints, ... and

an employee simply refused [to cooperate] and failed to return to work, a constructive discharge has not occurred."); *Davis v. Potter,* No. Civ. A. 03–1796, 2005 WL 3359180, at *10 (W.D.La. Dec.9, 2005) ("Davis' failure to return to work without giving her employer a fair opportunity to remedy the situation was unreasonable and fatal to her constructive discharge claim."); *Beltrami v. Special Counsel, Inc.,* No. 1:02–CV–2505–WBH–AJB, 2005 WL 6075365, at *9 (N.D.Ga. Feb. 11, 2005) ("Plaintiff's constructive discharge claim fails as a matter of law ... because Plaintiff failed to give his employer any opportunity to remedy the situation before he resigned."); *Harvill v. Westward Communications, LLC,* 311 F.Supp.2d 573, 586 (E.D.Tex.2004) ("[F]ailing to provide the company with a sufficient opportunity to correct the alleged harassment dooms a constructive discharge claim.").

Therefore, we find that the HRC was clearly wrong in finding that Mr. Akl proved his claim for constructive discharge.

## IV.

## CONCLUSION

Based upon the foregoing, we find the July 9, 2009, final order of the HRC to be clearly wrong in light of the reliable, probative, and substantial evidence in the record. We have determined from the record that the evidence was insufficient to sustain Mr. Akl's claims for disparate treatment, hostile work environment, and constructive discharge. Therefore, the July 9, 2009, final order of the HRC is hereby reversed.

Reversed.